**PENNSYLVANIA HOUSE, INC., a wholly owned subsidiary of Ladd Furniture, Inc., Plaintiff,**

v.

**Edward BARRETT, et al., Defendants.**

**No. CV–90–1046.**

United States District Court,
M.D. Pennsylvania.

March 15, 1991.

Paul W. Brann, Brann & Light, P.C., Lewisburg, Pa., for plaintiff.

G. Thomas Miller, Harrisburg, Pa., Edward I. Cutler, Carlton Fields Ward Emmanual, Smith & Cutler, P.A., Tampa, Fla., for defendant Laura K. Cruickshank.

## MEMORANDUM

McCLURE, District Judge.

### I. BACKGROUND

Plaintiff Pennsylvania House, Inc. ("Pennsylvania House") filed this diversity action [1] against defendants Nola Barrett, Edward Barrett and Laura Cruickshank to recover sums owed for furniture which it supplied to a retail furniture store, Heritage House Interiors, Inc., d/b/a Heritage House ("Heritage House"). Heritage House was owned and managed by the Barretts and had its principal place of business in Tampa, Florida. [2] The furniture was supplied pursuant to a "Gallery Agreement" executed by Pennsylvania House and Heritage House on February 1, 1989. [3]

All three defendants signed indemnity agreements (and addenda thereto) personally agreeing to indemnify Pennsylvania House against any loss as a consequence of default or failure to pay by Heritage House. Both the indemnity agreement executed by the Barretts and the one executed by Cruickshank contain a forum selection clause which reads:

This Agreement shall be construed under and in accordance with the law of the Commonwealth of Pennsylvania and **in the event of default of any of the par-**

1. See: 28 U.S.C. § 1332.

2. The Barretts are residents of Brandon, Florida. Laura Cruickshank is a resident of Cincinnati, Ohio.

3. The Gallery Agreement was executed by Nola Barrett in her capacity as President of Heritage House Interiors, Inc. d/b/a Heritage House.

ties, it is agreed that should either party deem it necessary to enforce this Agreement or exercise rights under this Agreement through legal remedies, that venue will lie in Union County, Pennsylvania.

(Plaintiff's complaint, filed June 4, 1990, Exhibit "C". Emphasis supplied.)

The indemnity agreement signed by Cruickshank on September 15, 1988 recites her obligations as follows:

... THE PARTY OF THE FIRST PART [IDENTIFIED ABOVE AS CRUICKSHANK] HEREBY AGREES TO INDEMNIFY AND SAVE HARMLESS PENNSYLVANIA HOUSE AGAINST ANY ALL LOSS, DAMAGE, COSTS AND EXPENSES WHICH PENNSYLVANIA HOUSE MAY HEREINAFTER SUFFER, INCUR OR BE PUT TO OR PAY BY REASON OF ANY CREDITS OR MONEY OR PROPERTY EXTENDED TO Heritage House Intrs d/b/a Heritage House, AND THE PARTY OF THE FIRST PARY (SIC) HEREBY AGREES TO PAY AND DISCHARGE FORTHWITH ON DEMAND OF PENNSYLVANIA HOUSE, EACH AND EVERY DEBT, OBLIGATION, OR CLAIM WHICH SHALL BE MADE, ASSIGNED, OR APPORTIONED AGAINST PENNSYLVANIA HOUSE BY REASONS OR ACTS OF Heritage House Intrs. d/b/a Heritage House.

. . . .

The PARTY OF THE FIRST PART [Cruickshank] hereby understands and agrees that Heritage House Intrs. d/b/a Heritage House obligation shall become effective upon the happening of any of the following:

1.1 Upon default in payment of the whole debt hereby secured or any part thereof, as the same shall become due and payable.

. . . . [Paragraphs 1.2 and 1.3 omitted.]

The entire debt then secure by this Indemnity Agreement shall at the option of PENNSYLVANIA HOUSE become immediately due and payable and the PARTY OF THE FIRST PART shall henceforth make immediate payment upon demand by PENNSYLVANIA HOUSE.

(Plaintiff's complaint, filed June 4, 1990, Exhibit "C". Emphasis original.) Directly beneath Cruickshank's signature, the indemnity agreement further states: "THIS AGREEMENT SHALL BE IN EFFECT UNTIL THE GALLERY FINANCING DEBT OBLIGATION, INCLUDING INTEREST, HAS BEEN PAID IN FULL." (Plaintiff's complaint, filed June 4, 1990, Exhibit "C". Emphasis original.)

The addendum to the indemnity agreement, also signed by Cruickshank on September 15, 1988, states in relevant part:

... This Indemnity Agreement does constitute my personal guaranty for payment to Pennsylvania House. This guaranty will become effective upon the happening of any of the following:

1. Default of any payment of any obligations by Heritage House Intrs. d/b/a Heritage House to Pennsylvania House.

2. The breach of any contract by Heritage House Intrs. d/b/a Heritage House with Pennsylvania House.

. . . . [Paragraph 3 omitted.]

4. Or for any of the terms or conditions as set forth in the Indemnity Agreement.

We/I further understand that Pennsylvania House can require payment in full, from me/us personally and/or attach my/our personal assets in order to satisfy any obligations due Pennsylvania House by Heritage House Intrs. d/b/a Heritage House.

(Plaintiff's complaint, filed June 4, 1990, Exhibit "C".)

Heritage House subsequently defaulted on its payments and filed bankruptcy proceedings. Pennsylvania House then filed this action against all three indemnors to recover an outstanding balance of $426,-505.78. The Barretts did not respond to the complaint, and default judgment was entered against them on December 7, 1990.

Before the court are two motions filed by the sole remaining defendant Laura Cruickshank: (1) a Rule 12(b) motion to dismiss plaintiff's complaint against her for lack of personal jurisdiction, lack of subject matter

jurisdiction and failure to state a claim upon which relief can be granted; and (2) a motion to quash service of process against her for lack of personal jurisdiction.

## II. DISCUSSION

### A. *Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction*

Cruickshank argues that this court lacks personal jurisdiction over her. She states that she is currently a resident of Cincinnati, Ohio and has no contacts with Pennsylvania. She concedes the existence of a forum selection clause in the indemnity agreement designating Union County, Pennsylvania as the jurisdiction where venue lies, but argues that the clause is unenforceable on two grounds: (1) it refers only to venue, not *in personam* jurisdiction; and (2) ownership of Pennsylvania House was transferred after Cruickshank executed the indemnity agreement on September 15, 1988, and it now brings this action as "Pennsylvania House, a subsidiary of Ladd Furniture, Inc. ("Ladd"), a North Carolina corporation," and not in the capacity in which it executed the indemnity agreement, i.e. Pennsylvania House, a division of Chicago Pacific Corp. ("Chicago Pacific"). Pennsylvania House disputes both contentions and submits an affidavit from Robin Strauser, Credit Manager for Pennsylvania House, which states that the transfer of ownership "made absolutely no difference" in the relationship between Pennsylvania House and gallery dealers, such as Heritage House, and did not "otherwise materially" change the risk which Cruickshank assumed under the terms of the indemnity agreement.

 Generally, if a non-resident defendant challenges *in personam* jurisdiction, the plaintiff bears the burden of proving that the defendant has the requisite minimum contacts[4] with the forum state. *Compagnie des Bauxites de Guinee v. L'Union,* 723 F.2d 357, 362 (3d Cir.1983) and *McKnight v. Civiletti,* 497 F.Supp. 657 (E.D.Pa.1980). "In actions involving forum selection clauses, however, analysis of the contacts with the forum state is inappropriate. Instead, the Court must consider the validity and effect of the forum selection clause in order to determine if there has been consent to *in personam* jurisdiction." *Mutual Fire, Marine and Inland Insurance Company v. Barry,* 646 F.Supp. 831, 833 (E.D.Pa.1986) (applying Pennsylvania law). With some exceptions not applicable here,[5] the Third Circuit considers the interpretation of forum selection clauses to be governed by state law.[6] *In re Diaz Con-*

---

**4.** Generally, to subject a non-resident to jurisdiction, due process requires that the defendant have minimum contacts with the forum state of such a character that maintaining the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Company v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Minimum contacts signify that the defendant has "purposefully [availed himself or herself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) and *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

In most instances, the law requires that the acts giving rise to the suit be connected with the forum state. See, e.g., *Piper Acceptance Corp. v. Roudybush,* 748 F.2d 471 (8th Cir.1984) and *Toro Co. v. Ballas Liquidating Co.,* 572 F.2d 1267 (8th Cir.1978).

**5.** State law generally applies to the "enforceability determination" absent "a significant conflict between some federal policy or interest and the

use of state law." *In re Diaz Contracting, supra,* 817 F.2d at 1050, citing *General Engineering Corp. v. Martin Marietta Alumina,* 783 F.2d 352, 356 (3d Cir.1986) and *Miree v. DeKalb County, Georgia,* 433 U.S. 25, 31–32, 97 S.Ct. 2490, 2494–95, 53 L.Ed.2d 557 (1977).

**6.** The Circuit Courts of Appeal disagree on this issue. Some circuits, e.g. the Ninth and Eleventh, have rejected the application of state law, and ruled that federal common law applies. See, e.g., *Manetti–Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 512–13 (9th Cir.1988) and *Stewart Organization, Inc. v. Ricoh Corp.,* 810 F.2d 1066, 1068 (11th Cir.1987) (per curiam), *aff'd on other grounds,* 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988).

In *Northwestern National Insurance Company v. Donovan,* 916 F.2d 372, 374 (7th Cir.1990), the Seventh Circuit Court of Appeals observed that the United States Supreme Court's holding in *Stewart, supra,* casts doubt on the continuing validity of the Third Circuit's position that the enforceability of forum selection clauses is governed by state law. The Seventh Circuit explained:

*tracting, Inc.,* 817 F.2d 1047, 1050 (3d Cir. 1987) (Higginbotham, J.) and *General Engineering Corp. v. Martin Marietta Alumina,* 783 F.2d 352, 356–57 (3d Cir.1986).

■ Generally, in diversity cases, such as the case *sub judice,* a federal district court must apply the choice of law rules of the forum state to determine which state's choice of law rules apply. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, if the parties have agreed on the law which governs interpretation of the contract, no analysis under the choice of law principles is required. Their agreement is controlling in the ab-

> ... The specific question in *Stewart* was whether, if a party moves for a change of venue under 28 U.S.C. § 1404(a) to the forum designated in the parties' forum selection clause, the court in considering the motion should treat the issue of the clause's validity as one of federal law; the Court said 'yes,' over a strong dissent by Justice Scalia which argued on grounds independent of the existence of section 1404(a)—particularly the spur to forum shopping that is created when the choice of a federal court over a state court determines the validity of a forum selection clause and hence the venue of the suit—that state law should apply. Probably, therefore, the parties before us are correct to concede that the issue of validity is one of federal law, though we need not decide this, since litigants are, within limits not exceeded here, permitted to designate what law shall control their case.
> The suggestion that the Supreme Court's decision in *Stewart, supra,* endorsed a rule different than that followed by the Third Circuit in earlier decisions (See the cases cited at pp. 442 and 443 *infra.*) does not alter our ruling in this case. Pennsylvania House and Cruickshank agreed in the indemnity agreement that Pennsylvania law governs interpretation of the contract, and we interpret that clause to apply to all provisions of the contract, including the forum selection clause.
> In *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 201 (3d Cir.1983), *cert. denied,* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983), Judge Gibbons noted that at that time although United States Supreme Court decisions suggested that federal law should apply, the issue was unresolved in the Third Circuit.
> The Supreme Court in *The Bremen* and in *Scherk* [*Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)] appears to have assumed without saying so that in a federal forum the enforceability of a forum selection clause is determined by a generally applicable federal law. This court

sence of fraud or some other circumstance which invalidates it. *Snavely's Mill, Inc. v. Officine Roncaglia, S.P.A.,* 678 F.Supp. 1126, 1129 n. 3 (E.D.Pa.1987) ("The enforceability of the forum selection clause is governed by the law which controls construction of the contract."). No such circumstance has been alleged here, so the parties' agreement that Pennsylvania law will govern [7] is controlling.

■ Under Pennsylvania law, forum selection clauses are *prima facie* enforceable and are negated only if the party challenging enforcement can show that operation of the clause will impose unreasonable re-

> in *Copperweld Steel Co. v. Demag–Mannesmann–Bohler,* 578 F.2d 953, 965–66 (3d Cir. 1978), appears to have made the same unarticulated assumption. It is not entirely clear why, absent a [federal] statute ..., the enforceability of a contractual forum selection clause should properly be divorced from the law which in other respects governs the contract.... (Citations omitted.) ... We noted the choice of law problem in *Central Contracting Co. v. Maryland Casualty Co.,* 367 F.2d 341, 344–45 (3d Cir.1966), and the absence of a discussion of it in *Copperweld Steel* suggests that in this circuit it remains unresolved. It need not be resolved in this case either, for each jurisdiction whose law is arguably relevant takes substantially the same position with respect to enforceability of contractual forum selection provisions.
> Subsequently, the Third Circuit resolved the issue in favor of the application of state law. See: *In re Diaz Contracting, Inc.,* 817 F.2d 1047, 1050 (3d Cir.1987), (Higginbotham, J.) and *General Engineering Corp. v. Martin Marietta Alumina,* 783 F.2d 352, 356–57 (3d Cir.1986).
> For a discussion of federal common law, see: *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972) (Forum selection clauses are presumptively valid and "should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances.") and *Coastal Steel, supra,* 709 F.2d at 202, where the Third Circuit Court of Appeals stated that forum selection clauses are enforceable under federal common law:
> > unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.

> 7. See pp. 440–41 *supra.*

straints or burdens, or that it was not entered into freely. *Mutual Fire, supra,* 646 F.Supp. at 833 and *Central Contracting Co. v. C.E. Youngdahl & Co.,* 418 Pa. 122, 133, 209 A.2d 810, 816 (1965). Operation of the clause is unreasonable only if litigating the action in the designated forum will seriously impede the objecting party's ability to fully and fairly pursue or defend the cause of action. A showing that the objecting party will have to tolerate some lesser inconvenience or annoyance (e.g. by incurring additional expenses) will not suffice. Something more than "mere inconvenience" must be demonstrated to negate the clause as unreasonable. *Mutual Fire, supra,* 646 F.Supp. at 833; *Central Contracting, supra,* 209 A.2d at 816; and *Continental Bank v. Brodsky,* 225 Pa.Super. 426, 311 A.2d 676 (1973). Cf. *Churchill Corp. v. Third Century, Inc.,* 396 Pa.Super. 314, 578 A.2d 532, 536 (1990), (Pennsylvania Superior Court refused to interpret a "boilerplate" forum selection clause in office equipment lease agreements between Pennsylvania lessees and a Missouri corporation as divesting Pennsylvania courts of jurisdiction over a dispute between the lessees and the lessor, because, *inter alia:* requiring Pennsylvania lessees to litigate the dispute in the Missouri courts would "seriously impair" their ability to defend their interests—"Where it is more expensive to defend a cause of action than to pay a default judgment solely because of the location in which the matter is being adjudicated, litigation in the foreign forum is no longer a matter of mere inconvenience or additional expense; rather it rises to the level of serious impair-

ment of the parties' ability to defend against the action.")

■ Cruickshank objects to enforcement of the forum selection clause on the basis that ownership of Pennsylvania House was transferred after she executed the agreement. She is arguing, essentially, that the change of ownership vitiated the agreement, although she phrases her argument in somewhat different terms.

■ Although the Pennsylvania appellate courts have not ruled on this precise issue, other courts which have done so have found, based on the application of general principles governing guaranty contracts, that a change of ownership of the creditor does not vitiate the guaranty, unless the change materially affects the risk assumed by the guarantor. Conversely, the guarantor is not liable if the underlying agreement is materially altered without his or her consent. A material alteration of the underlying obligation without the guarantor's consent operates as a discharge of his or her obligation.[8] *United States Shoe Corp. v. Hackett,* 793 F.2d 161 (7th Cir. 1986) (applying Wisconsin law); and *Essex International, Inc. v. Clamage,* 440 F.2d 547 (7th Cir.1971) (applying Illinois law). Cf. *Gritz Harvestore v. A.O. Smith Harvestore Products,* 769 F.2d 1225, 1231 (7th Cir.1985) (applying Wisconsin law) ("[A] compensated guarantor is not discharged unless there was a material alteration in the terms of the principal's obligation and unless that alteration works to the detriment of the guarantor; an uncompensated guarantor, on the other hand, may be discharged by any alteration in the principal's

---

**8.** In *United States Shoe Corp. v. Hackett,* 793 F.2d 161 (7th Cir.1986) (applying Wisconsin law), the court explained the rationale:

The principle that a big increase in risk discharges the guarantor is an implication of the fact that a guaranty is a commercial contract. The guarantor takes a risk in exchange for a benefit ... Unless the guarantor can estimate the size of the risk, he cannot tell whether the return in worthwhile. When events beyond the guarantor's control dramatically increase the risk, the assumptions on which the contract was founded are undercut. Usually a change in the terms of trade does not discharge a contract; an increase in the market

price of coal does not relieve a seller of making deliveries contracted for at a lower price; the risk of a change in price influences the price fixed in the contract, and the contract apportions risk. But most guarantees allow the guarantor to walk away on notice.... The principle that a substantial increase in risk avoids the guarantee rests on the assumption that guarantors would not ordinarily tolerate a big increase in the risk they face without seeking something in return. When there is such an increase, outside the guarantors' knowledge, courts treat the guaranty as if the right to revoke had been timely exercised.

obligation regardless of whether he is prejudiced by the change.'").

*Essex, supra,* is directly on point. Defendant Earl A. Clamage personally guaranteed payment of any balances owed for materials supplied by Greater Louisville Industries, Inc. ("Greater Louisville") to Monarch Products Corporation ("Monarch"). Clamage was the sole shareholder and chief executive officer of Monarch and signed a guaranty stating in relevant part:

> In consideration of Greater Louisville Industries having extended credit for materials that have been sold to or hereafter may be sold to Monarch.... I do hereby agree to personally guarantee and to pay on demand any sum or sums due or to become due Greater Louisville Industries, which remain unpaid after the due date thereof.

*Essex, supra,* 440 F.2d at 549. Greater Louisville subsequently sold its assets to Essex International, Inc. ("Essex") and thereafter, when Essex attempted to enforce the guaranty agreement, Clamage objected on the ground that it was not assignable. The district court disagreed and entered summary judgment against Clamage.

On appeal, the Seventh Circuit affirmed, refusing to "mechanically apply" the general rule of nonassignability of guarantees and stating that the "critical issue" was whether "the creditor-guarantee has attempted to impose on the guarantor an obligation which differs materially from that which he undertook to perform." *Essex, supra,* 440 F.2d at 551. If the assignment does not "materially alter" the risk undertaken by the guarantor, the court held, there is no reason to discharge the guarantor. The court explained:

> The rationale for the rule that a special guaranty is not assignable without the consent of the guarantor stems from the general contract principle that a man may be held only to the precise obligation he undertook. Variation between the terms of the guarantor's undertaking the dealings between the debtor and creditor-guarantee generally results in the discharge of the guarantor's obligation....

> Illinois recognizes the general rule of nonassignability of guarantees.... (Citation omitted.).... However, the Illinois courts have refused to apply the rule mechanically; rather they examine the factual setting of each case to determine whether the policy underlying the rule is applicable. The result is that the guarantor is not discharged unless the 'essentials of the original contract have ... been changed and the performance required of the principal is ... materially different from the first contemplated ...' (Citation omitted.) ... An obvious example is presented where the only variation from the terms of the guaranty contract is a change in the name of the debtor corporation.... We think that the same result would clearly be reached if the creditor corporation changed its name. Cf. *Glassine Paper Company v. Shannon,* 238 F.2d 765 (2d Cir.1956).

> A potentially more substantial variation from the precise terms of a guaranty is presented when the creditor-guarantee named in the instrument is involved in a merger or consolidation under statute. In that event the surviving corporation takes over the rights and obligations of the merging corporation by operation of law. But a merger or consolidation involving the creditor corporation does not necessarily discharge a guarantor any more than a mere change in corporate name does. Unless there is some material change in the business dealings between the debtor and the creditor-guarantee and some increase in the risk undertaken by the guarantor, the obligation of the guarantor is not discharged.

*Essex, supra,* 440 F.2d at 549–551.

Applying these concepts to the case before it, the court found that Essex' purchase of Greater Louisville's assets

> in no way altered the obligation which Clamage had undertaken. Greater Louisville remained a distinct business entity after the sale and carried on its business in substantially the same manner. The Fetters remained in charge in Greater Louisville and Clamage contin-

ued to deal with them personally. In fact, Clamage even continued to use the name 'Greater Louisville' in his purchase orders. Clamage was aware of the sale of Greater Louisville's assets shortly after it took place and he admits that he did not notice any change in Greater Louisville's business dealings with him. *Essex, supra*, 440 F.2d at 549–551. See also: *Continental Ozark, Inc. v. Lair*, 29 Ark.App. 25, 779 S.W.2d 187, 189 (1989) ("[T]he sale of an interest or change in ownership of a corporation does not in and of itself operate to extinguish the guarantor's obligation.... [T]he question of whether the guarantor has been discharged is dependent on the facts, and whether there has been a material alteration of the surety contract.") and *Anstalt v. F.I.A. Insurance Co.*, 749 F.2d 175, 180 (3d Cir. 1984), (applying New Jersey law) (The issue was whether a surety which guaranteed the performance of a seller of goods issuing a bond for the benefit of the buyer remained liable when the parties to the underlying contract substituted a different buyer. There were no New Jersey cases on point, but the Third Circuit predicted that the Supreme Court of New Jersey would hold that a compensated surety would not be discharged from its obligation because of an alteration in the underlying contract that was not material and did not increase the surety's risk or otherwise cause it to suffer harm, and that New Jersey law would permit the obligee to assign a surety's bond if the assignment did not prejudice the surety.)

Although there are no Pennsylvania cases addressing the issue of whether a guaranty remains enforceable if the structure or legal status of the creditor changes, there is case law supporting the proposition that changes in the underlying agreement do not vitiate a guaranty agreement unless they are material and are made without the guarantor's consent. In *Massey-Fergu-*

son, Inc. v. Finocchiaro Equipment Co., Inc.*, 496 F.Supp. 655 (E.D.Pa.1980), (applying Pennsylvania law), *aff'd without a published opinion*, 649 F.2d 859 (3d Cir. 1981), the court was confronted with a scenario in which after the defendant/guarantor signed a guaranty agreement—acknowledging personal responsibility for the debts of a sole proprietorship operated by her husband, her husband converted the business from a sole proprietorship to a corporation. The court rejected the wife's argument that this change automatically vitiated her guaranty agreement, stating:

> Despite the change in the structure of the enterprise from sole proprietorship to corporation, the equipment company always remained completely identifiable with Finocchiaro.... I perceive no manifest injustice to Marion Finocchiaro in holding that her guaranty extended to the debts of the corporation under the circumstances presented here.... Because the sole proprietorship had already begun expanded operations, **the incorporation of the equipment company did not materially change the nature of Finocchiaro's enterprise.** Similarly, **the simple expedient of incorporation did not automatically release Marion Finocchiaro from liability on her guaranty because the change in the nature of the business entity did not work a material change in the nature of her undertaking on the guaranty.**

The district court rejected the reasoning of cases compelling a different result in which the court failed "to look beyond the formal change in the principal debtor as effecting a release of the guarantor"[9] as elevating "form over substance" *Massey-Ferguson, supra*, 496 F.Supp. at 662.

Applying these principles to the case before us, we find that plaintiff has sufficiently demonstrated that the changes in corporate ownership of Pennsylvania House[10] did not materially alter its guaran-

---

**9.** See, e.g., *Wheeling Steel Corp. v. Neu*, 90 F.2d 139 (8th Cir.1937).

**10.** From the pleadings and the documents attached thereto, it is apparent that Pennsylvania House has changed ownership several times

since 1988. When Cruickshank signed the indemnity agreement on September 15, 1988, Pennsylvania House was a division of Chicago Pacific Corp. ("Chicago Pacific"), a Delaware corporation, and the agreement identifies it as such. The agreement with the Barretts identi-

447

ty agreement with Cruickshank or increase the risk she assumed thereunder. In opposition to Cruickshank's motion to dismiss for lack of personal jurisdiction, Pennsylvania House submitted an affidavit by its credit manager, Robin Strauser. Strauser attests to the following facts.[11]

... The legal structure of Pennsylvania House's ownership ... has made absolutely no difference in the manufacture and sale of the Pennsylvania House line of traditional furniture, the relationship between Pennsylvania House and its gallery dealers, and the criterion or terms and conditions upon which it accepts a retailer as gallery dealer and extends credit to the gallery dealers. During my entire association with Pennsylvania House (division or corporation), Pennsylvania House has operated as an autonomous unit.

....

The operations of Pennsylvania House as it existed when Pennsylvania House was a division of Chicago Pacific were not changed upon transfer of those operations of Maytag Corporation or upon transfer of those operations to Pennsylvania House, Inc. The decision to allow Heritage House to become a gallery and to obtain Pennsylvania House furniture on credit has been based on the same criterion at all times since the Gallery Agreement and the Indemnity agreements were presented to and accepted by Pennsylvania House. **Nothing has occurred in the relationship between Pennsylvania House and Heritage House subsequent to the assignment of the Pennsylvania House operations to Maytag Corporation and to Pennsylvania House, Inc. which has materially changed the terms and conditions upon which furniture was made available to Heritage House or otherwise materially changed the risk of Defendant Cruickshank of her guaranty of the indebtedness incurred by Heritage House.**

(Plaintiff's brief, filed November 9, 1990, Exhibit "A". Emphasis supplied.)

Strauser also states that she had "continuous contact" with Cruickshank regarding the operation of Heritage House before it declared bankruptcy, and further, that during negotiations, i.e. before she signed the indemnity agreement, Cruickshank was advised of the anticipated expenses involved in operating a Pennsylvania House furniture gallery and purchasing the inventory. Specifically, Strauser states:

Before Heritage House went into bankruptcy, I was advised that Defendant Cruickshank was a stockholder of Heritage House and had continuous contact with her regarding the operation of Heritage House. On August 25, 1989, Defendant Cruickshank through her attorney Paul C. Davis, notified Pennsylvania House that she revoked her continuing guarantee as it pertained to the credit extended to Heritage House in the future.

(Plaintiff's brief, filed November 9, 1990, Exhibit "A".) Strauser further states in her affidavit:

During the process of discussions regarding the Indemnity Agreement, Defendant Cruickshank was advised of the costs associated with purchasing the necessary furniture to establish a Pennsylvania House gallery and other costs which Heritage House could anticipate. Following these discussions, the following language was added to the Indemnity Agreement on behalf of Cruickshank's attorney.

THIS AGREEMENT SHALL BE IN EFFECT UNTIL THE GALLERY FI-

fies Pennsylvania House in the same fashion. The Gallery Agreement with Heritage House, executed five months later, on February 1, 1989, identifies Pennsylvania House as a division of Maytag Corporation, a Delaware Corporation. Thereafter, ownership was transferred to the present owner, Ladd. Pennsylvania House's principal place of business has, at all times, remained in Lewisburg, Pennsylvania.

11. Cruickshank, of course, simultaneously filed a Rule (12(b)(6) motion to dismiss for failure to state a cause of action upon which relief can be granted. We consider plaintiff's affidavit for the sole purpose of ruling on the motion to dismiss for lack of personal jurisdiction.

NANCING DEBT OBLIGATION, IN-CLUDING INTEREST, HAS BEEN PAID IN FULL.

Heritage House was accepted as a Pennsylvania House gallery dealer on February 1, 1989, at which time Pennsylvania House was a division of Maytag.... The Indemnity Agreements executed by Defendants Barrett and Cruickshank were part of the bargain upon which Heritage House was granted a Pennsylvania House gallery dealership with exclusive rights to sell Pennsylvania House trademarked furniture in the Tampa, Florida area and upon which Heritage House was furnished Pennsylvania House furniture and accessories.

Pursuant to the Pennsylvania House Gallery Agreement, Pennsylvania House furniture and related products were sold to Heritage House to establish the gallery displays, and financed by the execution of a Gallery Note and an Accessory Note. Thereafter, in the ordinary course of business, other Pennsylvania House furniture was ordered [sic] by Heritage House and sold on open account. At the time this suit was commenced, $240,-889.60 was owed on the Gallery Note, $18,392.08 was owed on the Accessory Note, and $167,224.10 was owned [sic] on open account.

(Plaintiff's brief, filed November 9, 1990, Exhibit "A".) Cruickshank has not filed any counter-affidavits or other evidence which controverts any of these representations. Based on the principles of guaranty law discussed above and plaintiff's uncontroverted representations that the changes in corporate ownership did not alter Cruickshank's risk as guarantor, we conclude that those changes did not vitiate the guaranty agreement.[12]

■ Cruickshank's second jurisdictional argument is that the clause in the indemnity agreement refers only to venue, not jurisdiction, and that it therefore cannot be interpreted as a consent to jurisdiction of the Pennsylvania courts.[13] We disagree. Venue selection clauses contain an implied consent to *in personam* jurisdiction. *Mutual Fire, supra,* 646 F.Supp. 833-34. There would otherwise be no reason for their existence, since consent to venue would be meaningless if *in personam* jurisdiction was lacking. See, e.g., *Northwestern National Insurance Co. v. Donovan,* 916 F.2d 372, 377 (7th Cir.1990).

### B. *Motion to quash service of process*

■ Laura Cruickshank's motion to quash service of process against her is grounded in the same objection as her motion to dismiss for lack of personal jurisdiction: she contends that she lacks the requisite minimum contacts with Pennsylvania. For the same reasons that her arguments against enforcement of the clause did not persuade us to vitiate the clause, this argu-

---

12. The language of the agreement itself further supports this conclusion. See, *Gritz, supra,* 769 F.2d at 1231. The indemnity agreement plainly sets forth Cruickshank's agreement to indemnify Pennsylvania House against any loss sustained by reason of "any credits or money or properly extended to Heritage House." Guaranty contracts are interpreted in the same manner as other contracts, and it is the court's responsibility to determine, and give effect to, the parties' plainly-stated intentions, as ascertained by a fair and reasonable interpretation of the terms they used and the language employed, and as read in light of the attendant circumstances and the purposes for which the guaranty was given. *Paul Revere Protective Life Insurance Co. v. Weis,* 535 F.Supp. 379, 386 (E.D.Pa.1981), *aff'd* 707 F.2d 1403 (3rd Cir.1982) and *sub nom., Appeal of Weis,* 707 F.2d 1405 (3rd Cir.1982) and *Hyster Credit Corp. v. O'Neill,* 582 F.Supp. 414, 416 (E.D.Pa.1983) (applying Pennsylvania law).

Under the circumstances, it is certainly reasonable to infer that the parties intended the agreement to remain in effect indefinitely and that they did not intend that it terminate upon any change in the corporate structure of Pennsylvania House. Guaranty agreements which do not specify a definite duration are generally considered to be continuing agreements, based on the assumption that the parties intend for them to remain in effect indefinitely or until such time as the guaranty is expressly revoked or the agreement is terminated by operation of law, etc. See, e.g., *Gritz, supra,* 769 F.2d at 1231.

13. Much of Cruickshank's argument focuses on her lack of contacts with Pennsylvania, but if the parties have agreed that actions will be litigated in a designated forum, the defendant's contacts, or lack thereof, with the forum state are irrelevant. The focus is, instead, on the reasonableness and enforceability of the clause.

ment likewise fails. The forum selection clause is enforceable against her, and renders her amenable to service of process for actions filed in this district. See generally: *Waterspring, S.A. v. Trans Marketing Houston, Inc.*, 717 F.Supp. 181, 186 (S.D.N.Y.1989), citing, *inter alia, Hamilton Life Insurance Company v. Republic National Life Insurance Company*, 408 F.2d 606, 613 (2d Cir.1969), ("An agreement to arbitrate in New York constitutes a consent to submit to the personal jurisdiction of the courts of New York and such consent 'includes consent to service by any method consistent with due process.' ")

C. *Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction*

Cruickshank's motion to dismiss for lack of subject matter jurisdiction is based on plaintiff's failure to allege that she is a citizen of Ohio, or some other state. The complaint alleges that only she is a resident, not a domiciliary, of Ohio, and Cruickshank argues that this is insufficient to establish diversity of citizenship under 28 U.S.C. § 1332.

 Cruickshank is correct. Pennsylvania House alleges only that she is a U.S. citizen and is "currently residing" at Cincinnati, Ohio. The plaintiff bears the burden of proving that diversity of citizenship exists on the date that the complaint is filed. *Ratner v. Lucisano Brothers*, 505 F.Supp. 124, 126 (E.D.Pa.1981). Citizenship and residency or domicile are not synonymous for purposes of establishing diversity. Although a party's residence is *prima facie* evidence of domicile, residency alone is insufficient to establish jurisdiction on the basis of diversity: two elements are necessary to establish domicile, residency coupled with an intent to continue to remain at that location. Because Pennsylvania House fails to allege Cruickshank's domicile, its complaint fails to establish diversity. *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir.1972); *Shiffler v. Equitable Life Assurance Society of the United States*, 663 F.Supp. 155, 163 (E.D.Pa.1986), *aff'd* 838 F.2d 78, 82 n. 5 (3d Cir.1988), (Allegations that plaintiff resides in Penn-

sylvania and that defendant is an insurance carrier with its principal place of business in New York are insufficient to establish diversity, since neither of these allegations establishes the citizenship of the parties.); *Coggins v. Carpenter*, 468 F.Supp. 270, 276–77 (E.D.Pa.1979) and *Reynolds v. Ranta*, 362 F.Supp. 333, 334 (W.D.Pa.1973).

Although Pennsylvania House states in its "Counterstatement of Facts" included in its opposing brief (filed November 9, 1990) that Cruickshank is a citizen of Ohio, this is not sufficient. Cruickshank's citizenship is crucial to this court's right to exercise subject matter jurisdiction over this controversy, and it should be alleged in the pleadings so that she has an opportunity to admit or deny it. We will grant Pennsylvania House leave to file an amended complaint. See generally: *In re Asbestos School Litigation*, 107 F.R.D. 369 (1985) (If subject matter jurisdiction is challenged, it is incumbent on the plaintiff to establish that jurisdiction is proper—and its efforts toward that end may be aided by discovery.)

D. *Rule 12(b)(6) motion to dismiss for failure to state a cause of action*

 The standards for ruling on a Rule 12(b)(6) motion are well-established. A complaint may not be dismissed for failure to state a claim upon which relief can be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which could entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court must accept all material allegations in the complaint as true and construe them in the light most favorable to the party opposing the motion. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Johnsrud v. Carter*, 620 F.2d 29 (3d Cir.1980); and *Truhe v. Rupell*, 641 F.Supp. 57, 58 (M.D.Pa.1985) (Rambo, J.). Although the complaint is to be liberally construed in favor of the plaintiff (See: Fed.R.Civ. 8(f)), the court does not have to accept every allegation it contains as true. Conclusory allegations of law, unsupported conclusions and unwarranted inferences

need not be accepted as true. *Conley, supra,* 355 U.S. at 45–46, 78 S.Ct. at 102.

Cruickshank argues that Pennsylvania House fails to state a cause of action against her because it does not allege the existence of a contractual relationship between them. She relies on the same contention that she asserted against enforcement of the forum selection clause, i.e. that the change of ownership of Pennsylvania House negated the guaranty agreement. This claim is untenable. Based on averments of plaintiff's complaint and the legal principles discussed above, it is not at all clear that Pennsylvania House "can prove no set of facts" in support of its claim which could entitle it to relief. *Conley, supra,* 355 U.S. at 45–46, 78 S.Ct. at 102. To the contrary, the plaintiff has alleged sufficient facts to indicate that it does have a viable claim against Cruickshank.

### ORDER

For all of the reasons stated in the accompanying memorandum, it is ORDERED that:

1. Defendant Laura Cruickshank's Rule 12(b) motion is granted in part and denied in part. Her motion to dismiss for lack of *in personam* jurisdiction is denied. Her motion to dismiss for failure to state a cause of action is denied. Her motion to dismiss for lack of subject matter jurisdiction is granted to the extent of the relief provided in this order.

2. Plaintiff is directed to file an amended complaint within twenty (20) days from the date of this order setting forth the basis for this court's exercise of diversity jurisdiction, specifically, alleging the state where Cruickshank is domiciled.

3. Defendant Cruickshank's motion to quash service of process is denied.