**GARDEN STATE TANNING,
INC., Plaintiff,**

v.

**MITCHELL MANUFACTURING
GROUP, INC., et al.,
Defendants.**

No. Civ.A. 98–4789.

United States District Court,
E.D. Pennsylvania.

July 6, 1999.

---

Walter H. Flamm, Robert E. Walton, Jennifer Walters Brown, Flamm, Boroff & Bacine, P.C., Blue Bell, PA, for Garden State Tanning, Inc., plaintiff.

John T. Carroll, III, Swartz, Campbell & Detweiler, Philadelphia, PA, Daniel J. Dugan, Spector, Gadon and Rosen, P.C., Philadelphia, PA, Robert J. Jonker, Dean Pacific, Warner, Norcross & Judd, LLP, Grand Rapids, MI, Erik G. Chappell, Mc Hugh, De Nune & Mc Carthy, Sylvania, OH, for Mitchell Manufacturing Group, Inc., Lamont Group, Inc., defendant.

Daniel J. Dugan, Spector, Gadon and Rosen, P.C., Robert J. Jonker, Dean Pacific, Warner, Norcross &Judd, LLP, Grand

Rapids, MI, Erik G. Chappell, Mc Hugh, De Nune & Mc Carthy, Sylvania, OH, for Mitchell Corporation of Owosso, defendant.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

Two of the defendants in this case, the Mitchell Manufacturing Group, Inc., and Mitchell Corporation of Owosso,[1] move for summary judgment on all plaintiff's claims against them. The motion will be granted in part and denied in part. The plaintiff has agreed to withdraw the counts alleging civil conspiracy and violations of the RICO statute, and they will therefore be dismissed. Consequently, the court will address the breach of contract, quantum meruit, unjust enrichment, fraudulent conveyance, common law fraud, and alter ego counts. The court will grant summary judgment as to fraudulent conveyance, common law fraud, and alter ego claims, but deny summary judgment as to the contract and quasi-contract claims.

### I. Background

The plaintiff, Garden State Tanning, Inc. (GST), sells leather used in automobile manufacturing. For many years, it sold leather to MMG, a wholly-owned subsidiary of Owosso. During 1997, MMG became increasingly delinquent in paying its bills to GST. As a result of pressure from GST, Owosso issued GST a guaranty for any sums not paid by MMG. The guaranty was put in writing in September 1997. GST also put MMG on a COD delivery basis. Following the guaranty and the change in the payment method, MMG began to bring its account current, and by March 1998 the delinquency was almost eliminated.

In February and March of 1998, Owosso informed GST that it was selling MMG to a third corporation, Lamont. Specifically, GST was told that "Mitchell Corporation of Owosso is in the process of closing on the sale of Mitchell Manufacturing Group, Inc. to a minority Group." At this time, Owosso also requested that MMG be taken off the COD delivery status. In the same letter, it reiterated the guaranty of September 1997 in exactly the same words.

GST complied with the request to remove MMG from COD basis and, prior to the date of the sale on April 22, 1998, MMG ran up $2.8 million in additional debt that was unpaid at the time of the sale. After the sale, Lamont MMG ordered more goods,[2] and, based on its belief that Owosso's guaranty still applied, GST continued to supply the goods. The debt accordingly grew by $1.3 million more after the sale to Lamont. Soon after the sale, Lamont MMG became insolvent, and these bills were never paid.

The claims in this case into two groups revolving on two central theories: (1) the meaning of the guaranties and (2) whether or not Owosso, Mitchell, and Lamont, or some combination of those entities, intentionally misled GST as to the nature of the sale and the guaranties in an effort to have GST extend credit for bills that the defendants knew could not be paid. As to the first issue, the court finds that it cannot grant summary judgment for defendants, and the motion will be denied as to the

---

1. As is apparent from reading the depositions and other materials submitted by parties, everyone involved in this case has had difficulty distinguishing between the defendants because of the similarities in names. For the sake of simplicity, regardless of the designations given by the individual parties, the court will utilize the following names: Defendant Mitchell Manufacturing Group, Inc., the subsidiary, is "MMG"; Defendant Mitchell Corporation of Owosso, the parent, is "Owosso;" The Lamont Group, Inc., the company that purchased MMG, is "Lamont"; and Mitchell Manufacturing Group, A Lamont Group Company, F/K/A/ Lamont Group Acquisition Corporation, the company that existed subsequent to the purchase of MMG, is "Lamont MMG."

2. There appears to be some dispute as to which company GST thought was ordering the product.

contract and quasi-contract issues. As to claims related to the allegations of fraud, the motion will be granted.[3]

## II. Discussion [4]

### A. The Guaranty Related Claims: Breach of Contract, Unjust Enrichment, and Quantum Meruit

MMG and Owosso request summary judgment on the claims pertaining to the guaranties: the breach of contract, unjust enrichment, and quantum meruit claims.

As to the breach of contract claims, MMG argues that the terms of its payment plan to GST mean that it ought not be held liable to GST for any debts not due at the time of the asset sale. Owosso argues that the guaranties it signed were not intended to cover any debts except those already owed at the time the guaranties in question were drafted, meaning that no post-guaranty invoices presented are owed by Owosso. Owosso also argues strenuously that even if the court were to take an expansive interpretation of the guaranties' language, GST's misconduct in extending credit and failing to notify Owosso that bills were not being paid should release Owosso from its guaranties as to amounts incurred after the sale. Finally, Owosso argues that the guaranties do not cover

any shipments that became due after the sale because the guaranties referred only to its "wholly owned subsidiary." The court finds that there are genuine issues of material fact on all of these points such that summary judgment would be inappropriate. There are too many ambiguities pertaining to the guaranties and the resulting transactions for the court to rule in defendants' favor.

As to MMG's arguments, it relies on Michigan interpretation of the UCC and argues that the plaintiff has not shown that MMG accepted the goods in question. Plaintiff correctly points out that all of MMG's contentions require additional factual development and cannot be decided on a motion for summary judgment, even assuming its statement of the law is correct.[5]

■ The court will now briefly address Owosso's arguments. Under Pennsylvania law, guaranty contracts are subject to the same rules of interpretation as other contracts. *See Meeting House Lane, Ltd. v. Melso*, 427 Pa.Super. 118, 628 A.2d 854, 857 (1993); *Hyster Credit Corp. v. O'Neill*, 582 F.Supp. 414, 416 (E.D.Pa. 1983). The well-settled rules of contractual interpretation in Pennsylvania were recently summarized by the Pennsylvania Superior Court:

**3.** On December 3, 1998, the court entered judgment against Lamont and Lamont MMG in the amount of $1,368,379.63 after Lamont and Lamont MMG agreed to this resolution. *See* Order of December 3, 1998.

**4.** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn therefrom in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, if the evidence presented by the parties conflicts, the court must accept as true the allegations of the non-moving party. *See id.* However, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

**5.** While MMG states that it is willing to accept judgment for the $1,080,849 owed by MMG before the sale, it places many conditions on this acceptance of debt owed, specifically, it states that this amount should be "minus the appropriate set-offs for payment and mitigation." *See* Def.Mot. for Summ.J. at 2. The court will not enter judgment on such a tenuous basis.

The paramount goal of contractual interpretation is to ascertain and give effect to the intent of the parties. In determining the intent of parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly. *Id., quoting PBS Coals, Inc. v. Burnham Coal Co.* 384 Pa.Super. 323, 558 A.2d 562, 564 (1989); *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1009 (3d Cir.1980) (noting same). Obviously, the strongest indication of the parties' intentions are the words of the contract. *See Mellon Bank,* 619 F.2d at 1009. The court should not attempt to rewrite a contract, and the contract must be construed as a whole. *See Meeting House Lane,* 628 A.2d at 857. If possible, the court should give meaning to all terms in a contract. *See id.* at 858; *see also Paul Revere Protective Life Ins. Co. v. Weis,* 535 F.Supp. 379, 386 (E.D.Pa.1981).

■ Unfortunately, the language of the guaranties in this case do not enable the court to form any firm conclusions. The guaranty of September 8, 1997, states in full as follows:

Following is the letter we have committed to Garden State Tanning:

We, Mitchell Corporation of Owosso, the parent company of Mitchell Manufacturing Group, Inc., do promise to pay in full all monies owed to you for goods received in the event Mitchell Manufacturing Group, Inc. do not pay.

This letter is renewable in one year if needed.

Def. Ex. D. The letter is addressed to Jeff Cowin, GST's credit manager, and signed by Helen Malik, MMG and Owosso's treasurer.

The March 3, 1998, guaranty reiterated these statements:

I am writing to confirm our discussion of today. I advised you that Mitchell Corporation of Owosso is in the process of closing on the sale of Mitchell Manufacturing Group, Inc. to a minority group. We are planning on closing this month. The minority group are planning on increasing sales to four times current sales. So there is a lot of potential for increased business.

We are requesting that we be removed from COD payment requirements as of February 27, 1998.

Mitchell Corporation of Owosso, the parent company of Mitchell Manufacturing Group, Inc., do promise to pay in full all moneys owed to you for goods received in the event Mitchell Manufacturing do not pay.

*See* Def. Ex.Def. Ex. E–2 (letter from Helen Malik to Jeff Cowin).

The guaranties in the present case, by their terms, seem to suggest that Owosso was taking responsibility for "any" debts that were not paid by MMG. The language does not limit the guaranties to the amounts owed at the time the guaranties were signed, and the court cannot conclude as a matter of law that they were intended to apply only to past due debts. *See Pennsylvania House, Inc. v. Barrett,* 760 F.Supp. 439, 448 n. 12 (M.D.Pa.1991) (noting that guaranties that "do not specify a definite duration are generally considered to be continuing agreements"). While Owosso strenuously argues that it never intended to guarantee anything except what was due at the time of signing, there is an abundance of testimony from parties at GST suggesting that the intent of the parties was much broader. *See, e.g.,* Def. Ex. C (Cowin Dep.) at 145–47 (stating that the March 3 guaranty was drafted specifically because GST wanted continuing assurances after the sale); *id.* at 182 (stating that it was understood that the guaranties applied to all shipments); *id.* at 187 (stating that GST wanted Owosso to continue to guarantee the debts); *id.* at 274; Def. Ex. G (Oren dep.) at 37–38 (testimony by Cowin's superior stating that guaranties were understood to cover all items); Plf. Ex. F (letter of March 6, 1998, referring to continuing guaranty and questioning how

or if the sale will affect the guaranty). GST also stresses that the interpretation of the past due debts only makes no sense because the debts of MMG were very small at the time the second guaranty was signed. In short, while the court makes no effort to catalog the full range of testimony and documentation supporting GST's position, there is evidence from which a reasonable factfinder could conclude that the parties intended the guaranties to cover all debts incurred by MMG, whether incurred before and after the sale or before and after the guaranties were signed.

These same issues of fact extend to the misconduct arguments and the claims pertaining to Owosso's liability post-sale. Summary judgment would also be inappropriate on the unjust enrichment and quantum meruit claims. Defendants argue that these claims must be dismissed because they do not apply if there is actually a contract between the parties. However, if defendants were to prevail on their interpretation of the guaranties, the plaintiff's allegations pertaining to defendants' representations may create an alternative basis for recovery on one of these theories.

### B. Other Claims

Plaintiffs also allege fraudulent conveyance, common law fraud, civil conspiracy, RICO, and an alter ego claim. Each of these claims relates to GST's allegations that Owosso and/or MMG intentionally deceived GST as to the nature of the sale that was to occur to Lamont. According to GST, it believed that the sale was to be a stock sale. In actuality, the sale was an asset sale, and Lamont thus acquired MMG's debts. From this fact, GST argues that had it known that Owosso was not retaining responsibility for MMG's liabilities and that it was actually selling all MMG's assets and liabilities, it would not have relied on the March 3 renewal of the

6. All parties agree that Michigan law applies to these claims.

7. The statutes that were named in plaintiff's complaint, Michigan Compiled Laws

guaranty, nor would it have extended further credit to MMG (whether in the form of MMG or Lamont MMG), nor would it have taken MMG off COD basis. Although these claims have a certain narrative cohesiveness, they are simply not backed up by any evidence of fraudulent intent. The court will consider each in turn.

### 1. Fraudulent Transfers

■ Pursuant to Michigan law,[6] GST alleges that the sale of MMG to Lamont was fraudulent. Plaintiff's response to the summary judgment motion states that it intends to sue pursuant to Michigan Compiled Laws §§ 566.34 and 566.35.[7] The first of these statutes states:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay, or defraud any creditor of the debtor.

Mich.Comp.Law. § 566.34 (4)(1)(a).

The second statute states:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mich.Comp.Law § 566.35 (5)(1).

Plaintiff's claims cannot proceed under either of these statutes because, as defendant argues, there is no evidence that rea-

§§ 566.14 and 566.15, have been repealed and redrafted in the form described in the text. The court accepts plaintiff's interpreta-

sonably equivalent value was not paid and there is no evidence of intent.

The only evidence before the court states that Lamont was to pay $6.5 million at closing, and additional sums later for a total purchase price of $24 million. *See* Def. Ex. B (Asset Purchase Agreement §§ 1.8, 1.9). Although it is clear that Lamont did not, in fact, have all of the purchase money or financing that it claimed to have, plaintiff has provided no evidence that Owosso or MMG were aware of this fact. *See, e.g.,* Def. Ex. K at 74–75 (testimony of Parker, Lamont's sole shareholder, stating that Owosso believed financing was available); Def. Ex. B § 4.3 (agreement clause stating that funds were available to complete cash portion of purchase). GST is also hampered by testimony of Cowin and his superior stating that they have no actual evidence supporting their allegations of fraud. *See, e.g.,* Def. Ex. C at 129–32 (deposition of Cowin admitting that he has no evidence that either Owosso or MMG knew that money and contracts were not in place); *id.* at 154–56 (stating that he has no proof that MMG was sold for less than fair consideration or that conveyance was fraudulent); Def. Ex. G at 24–28 (deposition of Oren stating that he had no knowledge to support claim that conveyance was fraudulent). While plaintiff argues that Lamont knew that the purchase of MMG was a dubious venture, the deposition testimony referred to is insufficient to create a genuine issue of material fact.

With respect to its claims under the actual intent statute, GST suggests that there are genuine issues of material fact as to whether: (1) the transfer was of substantially all of the debtor's assets, (2) the consideration was reasonably equivalent to the value of the asset transferred of the obligation incurred, (3) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, and, (4) the transfer occurred shortly before or after a substantial debt was incurred. The statute specifically enumerates these factors as indicating intent. *See* Mich.Comp.Law. § 566.34 (4)(2). However, even on considering this evidence, the only thing that plaintiff has demonstrated is that Lamont was not as solvent as it represented to Owosso and MMG and that it rapidly became unable to pay bills. Even acknowledging that plaintiffs will rarely have direct evidence of these claims and so must be permitted to provide indirect evidence, *see United States v. Rode,* 749 F.Supp. 1483, 1493 (W.D.Mich.1990), plaintiff's evidence is insufficient. Plaintiff simply states conclusorily that there is a genuine issue of fact as to the points described above, but provides no evidence in support of its claims. Defendants' motion must be granted.

### 2. Common Law Fraud

Plaintiff alleges common law fraud against Owosso and MMG. As to Owosso, GST states that Owosso's guaranties were made at a time that Owosso intended to sell MMG's assets and liabilities to Lamont and that it intended to avoid payment of the debts it guaranteed in this way. Similarly, GST alleges that MMG induced Owosso to enter into these guaranties so that it could continue to acquire goods for which it had no intention of paying.

■ Under Pennsylvania law, in order to make a showing of fraud, a plaintiff must demonstrate the existence of (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the result. *See Delahanty v. First Penn. Bank,* 318 Pa.Super. 90, 464 A.2d 1243, 1251 (1983).[8] It is

---

tion that the new laws apply to the claims made here.

**8.** Defendants suggest that there is a choice of law issue between Michigan and Pennsylvania both for this claim and the alter ego claim.

Neither party has provided sufficient analysis or facts for the court to rule conclusively on the matter. Consequently, for the sake of completeness, the court will consider the law of both jurisdictions. The choice of law

not enough for a plaintiff to simply point to a bad result and allege fraud: "Rather, plaintiff must ... inject precision and some measure of substantiation into the allegations of fraud." *Sun Co. v. Badger Design & Constructors*, 939 F.Supp. 365, 369 (E.D.Pa.1996).[9]

 Plaintiff cannot meet these burdens. As to MMG's alleged inducement, no evidence has been offered. Nor is there evidence from which the court can permit the fraud count against Owosso to proceed to trial. In deposition testimony, both Jeff Cowin and Rod Oren, his supervisor, admit that they have no personal knowledge to back up their claims of fraud; each, in essence, simply points to the bad result and alleges fraud. *See, e.g.*, Def. Ex. C. at 122–24 (Cowin admitting that MMG and Owosso may have believed that Lamont would be solvent); *id.* at 129 (conceding that he has no evidence that MMG or Owosso knew of Lamont's insolvency); *id.* at 158 (admitting that he has no personal knowledge that Owosso did not intend to make good on guaranties or pay debts); Def. Ex. G at 28–29 (deposition of Oren stating that he had no knowledge of evidence for fraud counts). Plaintiff refers repeatedly to the same arguments made with respect to the guaranty issues: that is, that Helen Malik made the guaranties knowing that GST intended for them to apply to future debts. Even if this is true, however, plaintiff has presented no evidence from which a reasonable fact finder could determine that Owosso or MMG had fraudulent intentions or that they knew Lamont was insolvent and would not be able to pay its bills.[10] Plaintiff has, in short, presented no evidence of intent from which the court can submit this matter to a jury.[11]

### 3. Alter-ego Claims

 Finally, plaintiff argues that Owosso should be held liable for all of MMG's debts under an alter ego theory.

Pennsylvania requires a very high showing of domination and control in order to establish "alter-ego liability." To begin with, courts "start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception."

In order to recover, the party seeking to pierce the corporate veil on an alter-ego theory must establish "that the con-

makes little or no difference, practically speaking, as the two states' formulations of the claims at issue are essentially identical.

9. While defendants rely on the argument that "mere non-performance of an agreement is not evidence of fraud," *Sun Co.*, 939 F.Supp. at 370, the court rejects this theory for summary judgment purposes. If plaintiff was able to demonstrate the malicious intention that it alleged was behind the guaranties, it would have demonstrated more than merely breach of contract. In such cases, the fraud claim and the contract claim would be distinct. *See, e.g., Margarite v. HRN Corp.*, Civ. A. No. 93–1379, 1993 WL 283980, *3 (E.D.Pa. July 21, 1993).

10. Under Pennsylvania law, the standard required is clear and convincing evidence. *See Delahanty v. First Penn. Bank*, 318 Pa.Super. 90, 464 A.2d 1243, 1251 (1983); *citing Beardshall v. Minuteman Press Int'l, Inc.*, 664 F.2d 23, 26 (3d Cir.1981). The standard of proof in Michigan is somewhat unclear. *See,*

*e.g., Nernberg v. Pearce*, 35 F.3d 247, 249–50 (6th Cir.1994) (stating that standard is "reasonable degree of certainty"). Consequently, for purposes of this motion, the court assumes that a lower standard of proof than clear and convincing applies.

11. The result would be the same under Michigan law. Under Michigan law, to demonstrate fraud, a plaintiff must show:

(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty[.]

*Nernberg*, 35 F.3d at 249–50 (citations omitted). As under Pennsylvania law, plaintiff simply has no evidence of intent.

trolling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." Alternatively, it is necessary to show that "the controlled corporation acted robot-or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons."

*Jiffy Lube Int'l v. Jiffy Lube,* 848 F.Supp. 569, 580 (E.D.Pa.1994) (citations omitted); *see also In Re Cohn,* 54 F.3d 1108, 1116 (3d Cir.1995) ("Well-established precedent holds that in order for one company to be held responsible for the actions of a related company, it is necessary that there be sufficient facts to pierce the corporate veil."); *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 643 (3d Cir.1991) (noting that the ordinary presumption is that parent and subsidiary are separate).[12] In determining an alter ego claim, the court should look to factors such as whether there is intermingling of funds, insufficient capitalization, nonfunction of officers and directors, failure to observe corporate formalities, failure to pay dividends, and the existence of a corporation as a facade for operations of the dominant shareholder. *See Jiffy Lube,* 848 F.Supp. at 580.

■ Plaintiff cannot make the required showing as to Owosso and MMG. Plaintiff argues that the common ownership of the companies is indicative of alter ego, but this is insufficient on its own to demonstrate the requirements of either Pennsylvania or Michigan law. Moreover, both Cowin and Oren testified that neither had any personal knowledge of facts that would support alter ego liability. *See* Def. Ex. C at 279–80 (Cowin dep.); Def. Ex. G at 36 (Oren dep.). The affidavit of Helen Malik provides support for defendants' claims that the proper formalities were always

observed between the two companies. *See* Def. Ex. N. ¶¶ 4–8 (affidavit stating that corporate formalities were always observed and that Owosso is biggest creditor of MMG). While plaintiff relies on Malik's deposition to suggest that the companies were not truly independent, *see* Plf.'s Resp. to Mot. for Summ.J. at 42, she emphasizes repeatedly that the corporations were independent in the ways relevant to an alter ego claim.

Consequently, the court will dismiss the alter ego claim and grant defendants' motion for summary judgment.

### 4. RICO and Civil Conspiracy

As the plaintiff has agreed to withdraw these claims, *see* Plf.Resp. to Mot. for Summ. J. at 39, 41, the defendants' motion will be granted on these counts.

### III. Conclusion

The defendants cannot demonstrate as a matter of law that their interpretation of the guaranty issues are correct. The language of the guaranties is not specific, and the testimony and exhibits of the plaintiff suggest that GST had the expressed intention that the guaranties would apply to any and all purchases made by MMG. Consequently, the court must deny summary judgment as to these counts. The related quasi-contract claims will also be denied. However, plaintiff cannot make a showing of the elements required for its fraud, fraudulent conveyance, and alter ego claims. The motion for summary judgment must be granted as to these counts.

An appropriate Order follows.

### ORDER

**AND NOW,** this 6th day of July, 1999, upon consideration of the Motion for Summary Judgment submitted by Mitchell

---

**12.** Similarly, Michigan law treats a corporation as a separate entity unless there is a showing of the following: "First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the cor-porate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff." *Foodland Distrib. v. Al–Naimi,* 220 Mich.App. 453, 559 N.W.2d 379, 381 (1997).

Manufacturing Group, Inc., and Mitchell Corporation of Owosso, and the response thereto, it is hereby **ORDERED** that the Motion is **GRANTED** in part and **DENIED** in part as follows:

(1) The motion is **DENIED** with respect to the breach of contract, unjust enrichment, and quantum meruit claims.

(2) The motion is **GRANTED** with respect to the RICO and civil conspiracy claims, based on Plaintiff's agreement to withdraw these counts.

(3) The motion is **GRANTED** with respect to the fraud, fraudulent conveyance, and alter ego claims. These counts are **DISMISSED.**