[Nos. 16373-0-II; 15593-1-II. Division Two. January 4, 1995.]

SAM KYSAR, ET AL, *Respondents*, v. GEORGE A. LAMBERT, *Appellant*.

---

*Lindsey H. Hughes* and *Hallmark Keating & Abbott PC; Brian A. Gillis* and *Parker Coulter Daley & White,* for appellant.

*William D. Robison* and *Morse & Bratt; Timothy J. Dack,* for respondents.

MORGAN, J. — George A. Lambert appeals a $28,000 judgment in favor of Sam and Joan Kysar. The Kysars cross-appeal an order denying reasonable attorney's fees. We affirm, except on the issues of terms and attorney's fees.

The Kysars grow Christmas trees in Clark County, Washington. They sell and ship the trees to distributors nationwide. In transit, the trees require a cool, moist environment,

for they can be damaged by temperatures that are too warm or too cold.

Lambert owns the Rainbow Fruit Co. in Boston, Massachusetts. He sells produce throughout the year, and Christmas trees during the Christmas season.

The Kysars sold trees to Lambert in 1987 and 1988. They shipped the trees from Washington to Massachusetts in refrigerated rail containers.

Lambert ordered trees again in 1989. According to Joan Kysar, he initiated the transaction on July 6, 1989, when he phoned the tree farm. According to Lambert, the Kysars initiated the transaction by contacting him in Boston.

In any event, it is undisputed that in July 1989 Joan Kysar filled out and signed a printed order form. She offered four loads of trees, at approximately 650 trees per load, for a total price of $30,160. She proposed a 25 percent deposit of $7,540, with the balance of $22,620 due on December 10, 1989. In handwriting on the front, she stated, "[a]ll trucks will be loaded to capacity".[1] In print on the back, the form stated:

> The terms and conditions of the order documents applicable to this transaction shall be interpreted under the case and statutory law of the State of Washington. In the event any action is brought to enforce such terms and conditions, venue shall lie exclusively in Clark County, Washington.[2]

Also in print on the back, the form contained an attorney's fee clause.

After signing the form, Joan Kysar mailed it to Lambert in Massachusetts. Later in July, he mailed it back with significant modifications. He reduced the number of loads from four to three; the number of trees per load from 650 to 550; and the total price from $30,160 to $19,140. He did not write in a method of shipment, or otherwise alter the handwritten statement that "[a]ll trucks will be loaded to capacity". He signed the form under a printed statement saying, "I have

---

[1]Clerk's Papers, at 150.

[2]Clerk's Papers, at 152.

read and accept the Terms of Sale on the reverse side of this document."[3]

On August 21, 1989, Lambert mailed the Kysars a letter and a 25 percent deposit ($4,785). The letter said:

> We understand that shipping will be the same as last year. There will be three loads of 1,650 trees at $11.60 for a total cost of $19,140.00.[4]

The Kysars understood the letter to mean that Lambert wanted the trees shipped by rail. According to their testimony, however, he later said he wanted the trees shipped by the least expensive means available, which was by truck.

In late November, the Kysars shipped three loads of trees by truck.[5] According to their testimony, Lambert was aware of the method of shipment before the first load left the farm.

Lambert inspected the trees when they arrived in Boston. According to his testimony, he found the trees "off-color" and the trucks "warm inside".[6] He then phoned the Kysars and rejected the trees. In his view, the trees "were neither properly shipped nor of the represented quality and, therefore, they failed to conform to the terms of his offer".[7]

On and after December 10, Lambert refused to pay the balance of the contract price. However, he "followed reason-

---

[3]Clerk's Papers, at 151.

[4]Clerk's Papers, at 43.

[5]The three loads contained more trees than Lambert had ordered (2,230 instead of 1,650), but that fact is immaterial to this appeal. The trial court ruled that Lambert was not liable for more than 1,650 trees, and neither party assails that ruling.

[6]Br. of Appellant, at 13.

[7]Br. of Appellant, at 12. The Kysars dispute this version of events. They say Lambert called the tree farm and complained that too many trees had been shipped. However, he did not assert that the trees had arrived in defective condition, nor did he reject the shipments. He first asserted that the trees were defective in December, when he was supposed to pay the balance due on his bill. Joan Kysar went to Boston, where she learned that Lambert had been storing the trees outside during extremely cold weather. She inspected the trees and found damage, but she attributed the damage to extreme cold rather than excessive warmth.

able instructions from the [Kysars] and made reasonable efforts to sell the trees".[8] According to his own testimony, he sold 810 trees for an average of about $40 each. He arranged for the remaining 1,420 trees to be chopped into mulch, at a cost of "$990 or $995".[9]

On June 26, 1991, the Kysars filed suit in the Superior Court for Clark County, Washington. They prayed for $33,244.85, which they alleged to be the contract price plus shipping costs and accumulated interest.

In September 1991, Lambert filed a countersuit in the Massachusetts Superior Court. On the Kysars's motion, that suit was removed to the United States District Court in Boston. The Kysars then brought a motion to dismiss. The District Court granted the motion, ruling that "[a]ccording to the terms of the contract[,] suit must be filed in State Court in Washington." *See Lambert v. Kysar,* 983 F.2d 1110, 1112 (1st Cir. 1993).

Lambert appealed to the United States Court of Appeals for the First Circuit. In 1993, that court affirmed by published opinion. *Lambert v. Kysar, supra.*

Meanwhile, in January 1992, back in the Clark County Superior Court, Lambert moved to dismiss the Kysars's Washington suit for lack of personal jurisdiction. The trial court declined to apply the long-arm statute, because it thought there were insufficient minimum contacts between Lambert and the State of Washington. However, it found that the parties had consented to personal jurisdiction, because they had agreed that "venue shall lie exclusively in Clark County, Washington". The trial court denied the motion to dismiss.

A jury trial was held in July 1992. At the end of the evidence, the trial court instructed that there was a contract as a matter of law, but that there were jury questions on whether the trees were of the promised quality and had

---

[8]Trial Br. of Appellant, at 7; Clerk's Papers, at 171.

[9]Br. of Appellant, at 13.

been properly shipped.[10] The court further instructed that if Lambert had rejected the trees, and if certain other conditions were satisfied, the Kysars had the right to recover the amount for which he had sold the trees, less reasonable expenses.[11]

---

[10]Instruction 16 stated in part:

"1. The order form dated July 6, 1989 filled out by Joan Kysar and sent to George Lambert indicating 4 loads — 2600 trees — amount $30,160 with $7,540 down payment, was an offer to sell on the terms contained on the front and back of it.

"2. The form was returned by Lambert with certain changes on it, such as 3 loads — 1650 trees — with total price reduced to $19,140. The amount paid down was $4,785. This was a counter-offer to the extent it differed from the provisions of the initial order form sent by Kysars.

"3. Acceptance of a counter-offer can occur without returning it signed when a party acts in reliance on the counter-offer and consistent therewith. Thus, when Kysars shipped the trees in 1989, they accepted the counter-proposal according to the terms of the amended form, the correspondence and any mutual agreement which you believe existed at the times of shipments.

"4. The fact that more trees were shipped than ordered on the amended form does not mean there was no contract for 1,650 trees. It was simply an overshipment which Lambert was free to accept, ignore or reject. Lambert is responsible for the excess trees only if you find there was an unconditional acceptance of them. However, if there was a conditional acceptance you must decide whether the conditions were fulfilled.

"5. Whether the trees shipped in 1989 were of the quality to be provided is solely a question for you to decide.

"6. Whether the method of shipment of the trees in 1989 was consistent with an agreement between the parties is for you to decide. In this regard you may consider such items as the documentation, and correspondence, any discussions between the parties, and the actions of the parties.

"You may also consider whether Lambert accepted, accepted conditionally, refused to accept or rejected the trees due to the method of shipment." Clerk's Papers, at 278-79. Lambert did not object to this instruction.

[11]Instruction 15 stated:

"When the seller has no agent or place of business at the market of rejection, a merchant buyer is under a duty after rejection of goods in his possession or control to follow any reasonable instructions received from the seller with respect to the goods and in the absence of such instructions, to make reasonable efforts to sell them for the seller's account if they are perishable or threaten to decline in value speedily.

"When the buyer sells goods on the seller's account, he is entitled to reimbursement from the seller or out of the proceeds for reasonable expenses of caring for and selling them, or for disposing of them.

"In complying with this section the buyer is held only to good faith and good faith conduct hereunder is not acceptance or the basis of an action for damages." Clerk's Papers, at 277. Lambert did not object to this instruction.

In their summation to the jury, the Kysars argued that Lambert had accepted the trees and was obligated to pay in accordance with the contract. *See* RCW 62A.2-301; RCW 62A.2-607(1). Alternatively, they argued that even if Lambert had rejected the trees, he was required to remit the amount for which he had sold the trees, less reasonable expenses. *See* RCW 62A.2-603. Based on Lambert's testimony, they said this amount was 810 trees multiplied by the average sale price of $40 per tree.[12] Lambert objected to the alternative argument, but the trial court overruled.

The jury returned a $28,000 verdict for the Kysars,[13] and the trial court entered judgment accordingly. The trial court also denied various posttrial motions, including the Kysars's motion for reasonable attorney's fees.

Both parties now appeal to this court. Lambert asserts error concerning contract formation, contract performance, personal jurisdiction, and several other matters. The Kysars assert error concerning reasonable attorney's fees.

# I
## CONTRACT FORMATION[14]

Lambert argues that as a matter of law, the parties failed to form a contract. We disagree.

In *Lambert v. Kysar, supra*, the First Circuit ruled:

> Under the law of both Massachusetts and Washington, the order form (signed and forwarded to Lambert in July 1989) comprised an offer to contract in accordance with its terms. It set forth in detail all the material terms essential to the proposed transaction, including the price, quantity and quality of the goods.

(Footnote omitted.) 983 F.2d at 1114.

---

[12]Multiplying erroneously, the Kysars asserted that if Lambert sold 810 trees at $40 each, he would have received $28,000. In fact, he would have received $32,400.

[13]According to Lambert, a comparison of the alternative argument with the amount of the verdict shows that the jury accepted the alternative argument. We disagree. Moreover, even if we agreed, our analysis would not be changed.

[14]In his brief on appeal, Lambert intertwines this issue with the issue of personal jurisdiction. This approach generates confusion, and for clarity we analyze the two issues separately.

Under the law of both Washington and Massachusetts, Lambert's substitution of a substantially lower quantity term amounted to a rejection of the Kysars' offer to sell, and a counteroffer to purchase the lesser quantity of trees.`. . . .`

983 F.2d at 1115.[15]

Whether the Kysars accepted Lambert's counteroffer in August, by accepting his deposit check, or by seasonably shipping the number of Christmas trees requested in Lambert's counteroffer, under the law of both Washington and Massachusetts the Kysars accepted Lambert's counteroffer by November 1989 at the latest. The Kysars' acceptance, whenever it is deemed to have occurred, operated under the law of both jurisdictions to bind the contracting parties to all terms printed on the reverse side of the original order form, including the forum selection clause.

(Citations omitted.) 983 F.2d at 1116.

■ Although we are not obligated to adhere to this reasoning, we elect to do so because we find it persuasive with respect to the trial record before us.[16] Lambert's only significant response is that there could be no contract without a shipping term, and that no shipping term was agreed on by the parties. That response runs counter to the Uniform Commercial Code (UCC), which states that a contract can exist although one or more terms are left open. RCW 62A.2-204(3). Like the trial court and the First Circuit, we hold there was a contract as a matter of law.

## II

### CONTRACT PERFORMANCE

Lambert says the Kysars should not have been allowed to argue, in their summation to the jury, that if he had rejected the trees, they were entitled to recover the proceeds for

---

[15]Parenthetically, the First Circuit also ruled:

"Since Lambert's alteration of the quantity term amounted to a *rejection* of the original offer, rather than a mere *modification* or *supplementation* of the boilerplate language in the original offer form, this is not an appropriate case for the application of U.C.C. § 2-207(2), Mass.Gen.L. ch. 106 § 2-207(2), Wash.Rev. Code 62A.2-207(2). . . ." 983 F.2d at 1115.

[16]The record before us is not necessarily the same as the one that was before the First Circuit. Our record was made at trial in Clark County, and we presume the First Circuit's was made at motion hearings in Boston.

which he had sold the trees.[17] The Kysars's argument was based on RCW 62A.2-603, so we refer to it as a "603" argument.

After a seller has physically delivered goods pursuant to a sales contract that falls under the UCC, the rights of the seller and buyer are affected by at least two factors. One is whether the goods are conforming or nonconforming. Another is whether the buyer accepts or rejects the delivered goods.[18]

These factors result in a consistent and comprehensive statutory scheme:

1. If the seller delivers conforming goods, which the buyer accepts, the buyer owns the goods, RCW 62A.2-401(2), and must pay in accordance with the contract. RCW 62A.2-301; RCW 62A.2-607(1). Assuming no evidence of breach, neither side will be entitled to damages.

2. If the seller delivers nonconforming goods, which the buyer accepts, the buyer owns the goods, RCW 62A.2-401(2), and must pay at the contract rate. RCW 62A.2-607(1). Because the seller who delivers nonconforming goods is generally in breach of contract, RCW 62A.2-301 (seller's obligation is to deliver goods in accordance with contract), the buyer often will be entitled to damages. *E.g.*, RCW 62A.2-714(2) (damages for breach of warranty);[19] RCW 62A.2-715 (consequential and incidental damages). The buyer often can offset

---

[17]Lambert also argues the Kysars should not have been allowed to argue a right to recover "gross" proceeds, as opposed to proceeds less reasonable expenses. We think, however, that it was the Kysars's right to argue for the return of the proceeds of sale, and Lambert's obligation to argue for the deduction of reasonable expenses. Lambert failed to so argue, despite instruction 15, and he is not now entitled to protest that failure.

[18]Generally, a buyer has the duty to accept conforming goods, RCW 62A.2-301; the right to accept nonconforming goods, RCW 62A.2-601(b); the right to reject nonconforming goods, RCW 62A.2-601(a); and the power, but not the right, to reject conforming goods. RCW 62A.2-401(4) (buyer's rejection, even if unjustified, revests ownership of goods in seller).

[19]Generally, breach of warranty damages are measured by "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted . . .." RCW 62A.2-714(2). *See also* RCW 62A.2-711 through RCW 62A.2-716.

such damages against his or her obligation to pay at the contract rate. RCW 62A.2-717.

3. If the seller delivers conforming goods, which the buyer rejects, the seller owns the goods after rejection. RCW 62A.2-401(4); *see* RCW 62A.2-602(2)(a). Thus, subject to RCW 62A.2-603,[20] the buyer must hold the goods "with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them". RCW 62A.2-602(2)(b). Because the buyer who rejects conforming goods is generally in breach of contract, RCW 62A.2-301 (buyer's obligation is to accept and pay in accordance with contract), the seller often will be entitled to damages. *E.g.*, RCW 62A.2-708(1) (nonacceptance damages);[21] RCW 62A.2-710 (consequential and incidental damages).

4. If the seller delivers nonconforming goods, which the buyer rejects, the seller owns the goods after rejection. RCW 62A.2-401(4); *see* RCW 62A.2-602(2)(a). After rejection, subject to RCW 62A.2-603,[22] the buyer must hold the goods "with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them". RCW 62A.2-602(2)(b). Because the seller who delivers nonconforming goods is generally in breach of contract, RCW 62A.2-301 (seller's obligation is to deliver goods in accordance with the contract), the buyer often will be entitled to damages. *E.g.*, RCW 62A.2-713(2) (nondelivery damages);[23] RCW 62A.2-715 (consequential and incidental damages). Without so holding,

---

[20]According to RCW 62A.2-602(2), the obligation described in this sentence is also subject to RCW 62A.2-604, but that statute is not pertinent here.

[21]Generally, nonacceptance damages are measured by "the difference between the market price at the time and place for tender and the unpaid contract price . . . less expenses saved in consequence of the buyer's breach". RCW 62A.2-708(1). *See also* RCW 62A.2-703 through RCW 62A.2-710.

[22]According to RCW 62A.2-602(2), the obligation described in this sentence is also subject to RCW 62A.2-604, but that statute is not pertinent here.

[23]Generally, nondelivery damages are measured by "the difference between the market price at the time when the buyer learned of the breach and the contract price", less expenses saved in consequence of the seller's breach. RCW 62A.2-713(1). *See also* RCW 62A.2-711 through RCW 62A.2-716.

we assume the buyer can offset such damages against any obligation the buyer has to the seller.

As stated in (3) and (4), the buyer's obligation to hold goods for "the seller's disposition" is subject to RCW 62A.2-603. That statute provides that when a merchant buyer rejects perishable goods in his or her possession, and the seller has no agent or place of business at the market of rejection, the merchant buyer, in the absence of contrary instructions from the seller, must make reasonable efforts to sell the goods "for the seller's account". RCW 62A.2-603(1). The goal is to minimize loss by requiring the merchant buyer to sell perishable property (*see* RCW 62A.2-401(4)) in a market where the seller is not present, in exchange for the reasonable expenses of sale and, sometimes, a commission.[24] RCW 62A.2-603(2). Because the sale is "for the seller's account", the seller owns the proceeds of sale in lieu of the goods, and the merchant buyer must remit the proceeds, less any reasonable expenses of sale and any applicable commission. RCW 62A.3-603(2). We assume, but do not hold, that this "603" obligation can be offset against any damages the buyer is entitled to recover.

Much of this statutory scheme was implicated in the trial of this case. The Kysars contended that they had delivered conforming goods, which Lambert had accepted and sold to the public. If the jury agreed, Lambert was obligated to pay according to the contract. RCW 62A.2-301; RCW 62A.2-607(1).

In contrast, Lambert contended that he had rightfully rejected nonconforming goods. If the jury agreed, the Kysars owned the trees after rejection. RCW 62A.2-401(4). Thus, Lambert did not have to pay the contract price, but he had to remit to the Kysars, in lieu of the perishable trees, the money for which the trees had been sold, less reasonable expenses of sale.[25] RCW 62A.2-603. He was entitled to prove, and we assume to offset, a claim for damages (*e.g.*, damages

---

[24]No commission was ever claimed in this case.

[25]The conditions that must be met in order to apply RCW 62A.2-603 were all undisputed: Lambert was a merchant buyer, the Kysars had no agent or office in the Boston area, and the trees were perishable goods. Also, Lambert did not claim a commission.

measured by "the difference between the market price at the time when the buyer learned of the breach and the contract price", RCW 62A.2-713(1)), but he made no attempt to do so.

Viewing Lambert's contention in light of the statutory scheme, it is difficult to see why the Kysars would have lacked the right to make a "603" argument. Nevertheless, Lambert advances at least four reasons.

Lambert asserts that the "603" argument was not within the pleadings. In his answer, however, Lambert alleged, implicitly if not explicitly, that he had rightfully rejected the trees. If he proved that allegation, he would have to remit the net proceeds of the trees in accordance with RCW 62A.2-603.[26] Clearly, then, a "603" argument was within the scope of his answer, and within the scope of the pleadings.[27]

Next, Lambert insists that the "603" argument was, in effect, an unpleaded cause of action for unjust enrichment. As already noted, Lambert's defense was that he had rightfully rejected nonconforming goods. The Kysars's reply was that if Lambert was right, he was nonetheless required to remit the net amount for which he had sold the trees. RCW 62A.2-603. Both the defense and the reply were part of a statutory claim brought under the UCC, and neither implicated a common law action for unjust enrichment. *Cf. Chemical Bank v. WPPSS*, 102 Wn.2d 874, 904, 691 P.2d 524 (1984) (unjust

---

[26]We reiterate that the conditions which must be met in order to apply RCW 62A.2-603 were all undisputed. See the preceding footnote.

[27]Even if the "603" argument were beyond the scope of the pleadings, we would now treat it as if raised therein. CR 15(b) provides in part:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. . . .

At trial, both sides litigated whether Lambert had rejected nonconforming goods. A finding for Lambert on that issue meant that he was required to remit to the Kysars the amount for which he had sold the trees, less reasonable expenses of sale. RCW 62A.2-603. It follows that both sides litigated whether he was required to remit the amount for which he sold the trees, and that matter should now be treated as if raised in the pleadings.

enrichment is common law cause of action), *cert. denied*, 471 U.S. 1065, 471 U.S. 1075 (1985); *Bill v. Gattavara*, 34 Wn.2d 645, 650, 209 P.2d 457 (1949) (same).

Next, Lambert asserts that the "603" argument was not supported by sufficient evidence. However, the record is sufficient to support a finding that Lambert rejected the trees — indeed, Lambert so testified, and rightful rejection was his theory of the case. Additionally, it was undisputed that the Kysars and Lambert were merchants, that the Kysars had no agent or office in Massachusetts, and that the trees were perishable goods. No other evidence was needed, under the circumstances present here.

■ ■ Lastly, Lambert asserts that a seller's recovery under RCW 62A.2-603 cannot exceed the contract price of the rejected goods. We disagree for two reasons. First, we construe a statute according to its plain meaning, *see Geschwind v. Flanagan*, 121 Wn.2d 833, 841, 854 P.2d 1061 (1993), and RCW 62A.2-603 simply does not contain a cap or ceiling in the amount of the contract price. Second, to read the statute as Lambert suggests would cause it to be inconsistent with the statutory scheme described above. A key part of that scheme, as already seen, is that the seller owns rejected goods, whether or not the rejection was justified. RCW 62A.2-401(4). That being true, the seller should be able to retrieve the rejected goods or, if they are perishable, their net proceeds, without regard to a cap or ceiling in the amount of the contract price.[28] We conclude that the trial court did not err in allowing the Kysars to argue as they did.

---

[28]Lambert also argues that if the statute is read without a cap or ceiling in the amount of the contract price, it will be misused. Without a cap, he hypothesizes, a seller could intentionally deliver nonconforming goods worth more than the contract price, then require the buyer to sell the goods and remit an amount greater than the contract price. He deems this an "illogical, commercially unsound result" that "allows sellers of noncomplying, rightfully-rejected goods to recover amounts from the buyer far greater than any contract price ever contemplated". Br. of Appellant, at 36.

Lambert hypothesizes a danger that is minimal or nonexistent. RCW 62A.2-603 applies only when a merchant buyer is involved. RCW 62A.2-603(1). A merchant buyer, like other buyers, can accept or reject nonconforming goods. RCW 62A.2-601. A merchant buyer generally will be able to make an informed judg-

## III

### PERSONAL JURISDICTION

Lambert argues that the trial court lacked jurisdiction over his person. The Kysars respond that the court had jurisdiction because of (A) Lambert's consent and (B) Washington's long-arm statute.

### A

A written agreement can show consent to personal jurisdiction, particularly in the commercial context.[29] As the United States Supreme Court has said:

> We have noted that, because the personal jurisdiction requirement is a waivable right, there are a "variety of legal arrangements" by which a litigant may give "express or implied consent to the personal jurisdiction of the court." For example, particularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction. Where such forum-selection provisions have been obtained through "freely negotiated" agreements and are not "unreasonable and unjust," their enforcement does not offend due process.

(Citations omitted.) *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985); *see also M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10-11, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972); *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1406 (1994); *Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 375 (7th Cir. 1990); *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1290, 1292 n.4 (7th Cir. 1989). An agreement that shows consent "is to be respected unless the challenging party 'clearly show[s] that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.' " 983 F.2d at 1119 (quoting *Zapata*, 407 U.S. at 15); *Exum v. Vantage Press, Inc.*, 17 Wn.

---

ment on whether the value of nonconforming goods exceeds the contract price. Ordinarily, then, a merchant buyer will accept nonconforming goods that have value in excess of the contract price, and RCW 62A.2-603 will not come into play.

[29]We do not consider the consumer context. Neither side in this case was a consumer, and neither alleges any sort of overreaching.

App. 477, 478-79, 563 P.2d 1314 (1977) (Washington, as nonchosen forum, refused to accede to "unfair and unreasonable" choice-of-forum clause).

To determine whether a particular agreement shows consent, it is necessary to distinguish between a choice-of-forum clause, on the one hand, and a choice-of-law clause on the other. A choice-of-forum clause is one in which the parties agree on a presiding tribunal. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587-88 113 L. Ed. 2d 622, 111 S. Ct. 1522, 1524 (1991) ("all disputes . . . shall be litigated . . . before a Court located in the State of Florida"); *Zapata*, 407 U.S. at 2 ("Any dispute arising must be treated before the London Court of Justice."); *Chan*, at 1406 n.11 ("[a]ll disputes . . . shall be litigated . . . before a court of proper venue located in the State of Washington"); *Heller*, 883 F.2d at 1290 ("exclusive jurisdiction and venue" shall be in Illinois). A choice-of-law clause is one that "designates only the body of law to be applied in resolving the dispute, not the location for its resolution". *Plus Sys., Inc. v. New England Network, Inc.*, 804 F. Supp. 111, 118 (D. Colo. 1992); *see also Burger King*, 471 U.S. at 482; *Heller*, 883 F.2d at 1292 n.4. Speaking generally, a choice-of-forum clause shows consent to personal jurisdiction, *Zapata; Chan*, at 1406–07; *Heller*, 883 F.2d at 1292 n.4; *see Burger King*, 471 U.S. at 472 n.14, while a choice-of-law clause does not. *Burger King*, 471 U.S. at 482 (choice-of-law provision alone "insufficient to confer jurisdiction"); *Heller*, 883 F.2d at 1292 n.4; *Plus Sys.*, 804 F. Supp. at 118.

 According to most courts, a choice-of-forum clause shows consent to personal jurisdiction, even though it refers only to venue.[30] In *Northwestern Nat'l Ins. Co. v. Donovan, supra*, the parties' contract said, "[v]enue . . . shall be in [Milwaukee County, Wisconsin]". 916 F.2d at 374. Holding that this clause exhibited consent to personal jurisdiction,

---

[30]Florida is contrary, *McRae v. J.D./M.D., Inc.*, 511 So. 2d 540, 542 (Fla. 1987); *Alexander Proudfoot Co. World Headquarters v. Thayer*, 877 F.2d 912, 918 (11th Cir. 1989) (applying Florida law), and in Alabama parties cannot confer personal jurisdiction by consent. *White-Spunner Constr., Inc. v. Cliff*, 588 So. 2d 865, 866 (Ala. 1991).

even though it referred only to venue, the Seventh Circuit said:

> The clause certainly is not as clear as it could be. It should just have said, "In the event of litigation or arbitration, the undersigned consents to suit . . . in Milwaukee County." But this is what it must mean. There would be no point to a clause that placed venue in Milwaukee County . . . but left the defendants free to object that they were outside the court's jurisdiction.

(Citations omitted.) 916 F.2d at 376-77; *accord Northwestern Nat'l Ins. Co. v. Dennehy*, 739 F. Supp. 1303, 1306 (E.D. Wis. 1990) ("[t]he court finds that when a party consents to venue in a particular court, it implicitly consents to the exercise of personal jurisdiction by that court"); *Mutual Fire, Marine & Inland Ins. Co. v. Barry*, 646 F. Supp. 831, 833-34 (E.D. Pa. 1986) ("the courts have determined that venue selection clauses contain an implied consent to personal jurisdiction").

Similarly, in *Pennsylvania House, Inc. v. Barrett*, 760 F. Supp. 439, 441 (M.D. Pa. 1991), the parties' contract said, "it is agreed that should either party deem it necessary to enforce this Agreement or exercise rights under this Agreement through legal remedies, that venue will lie in Union County, Pennsylvania". The court held:

> Cruickshank's second jurisdictional argument is that the clause in the indemnity agreement refers only to venue, not jurisdiction, and that it therefore cannot be interpreted as a consent to jurisdiction of the Pennsylvania courts. We disagree. Venue selection clauses contain an implied consent to *in personam* jurisdiction. There would otherwise be no reason for their existence, since consent to venue would be meaningless if *in personam* jurisdiction was lacking.

(Footnote and citations omitted.) 760 F. Supp. at 448. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d Cir. 1977) (agreement to arbitrate in New York constituted implied consent to personal jurisdiction in New York; "[t]o hold otherwise would be to render the arbitration clause a nullity") (quoting *Victory Transp., Inc. v. Comisaria Gen.*, 336 F.2d 354, 363 (2d Cir. 1964), *cert. denied*, 381 U.S. 934 (1965)); *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1348 (S.D.N.Y. 1988) (same).

In this case, the parties' agreement contained consent to personal jurisdiction. As already noted, it said:

> The terms and conditions of the order documents applicable to this transaction shall be interpreted under the case and statutory law of the State of Washington. In the event any action is brought to enforce such terms and conditions, venue shall lie exclusively in Clark County, Washington.[31]

The first sentence was only a choice-of-law clause and is not pertinent here. The second sentence, however, is highly pertinent, for the only way in which venue could "lie exclusively in Clark County" was if the parties were intending to consent to personal jurisdiction in Washington. Thus, their agreement exhibits such consent, and the trial court did not err by denying Lambert's motion to dismiss.

### B

A second, independently sufficient basis for personal jurisdiction is the long-arm statute, RCW 4.28.185. Moreover, this is true regardless of whether the Kysars first contacted Lambert, as he asserts, or he first contacted them, as they assert.

RCW 4.28.185 states in part:

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:
>
> (a) The transaction of any business within this state[.]

■■ RCW 4.28.185 "extends jurisdiction to the limit of federal due process". *Shute v. Carnival Cruise Lines,* 113 Wn.2d 763, 771, 783 P.2d 78 (1989); *Chan,* at 1405; *MBM Fisheries, Inc. v. Bollinger Mach. Shop & Shipyard, Inc.,* 60 Wn. App. 414, 423, 804 P.2d 627 (1991). Federal due process permits the exercise of jurisdiction when there have been purposeful minimum contacts between the defendant and the forum state, the plaintiff's cause of action arises out of or relates to those contacts, and the exercise of

---

[31]Clerk's Papers, at 152.

jurisdiction is reasonable, *i.e.*, consistent with notions of fair play and substantial justice. *Grange Ins. Ass'n v. State*, 110 Wn.2d 752, 758, 757 P.2d 933 (1988) (citing *Burger King*, 471 U.S. at 472-78; *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987)), *cert. denied*, 490 U.S. 1004 (1989); *see also Tyee Constr. Co. v. Dulien Steel Prods., Inc.*, 62 Wn.2d 106, 115-16, 381 P.2d 245 (1963). Thus, RCW 4.28.185 authorizes the exercise of jurisdiction under these same conditions.

Several Washington cases apply these principles to situations like this one. In *Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc.*, 71 Wn.2d 679, 430 P.2d 600 (1967), Bayly was doing business in California, and Griffiths was doing business in Washington under the name Farwest General Agency. Bayly asked Farwest to obtain insurance through Farwest's London broker, and Farwest complied.[32] According to the Washington Supreme Court, long-arm jurisdiction was proper because, "[w]hen defendant, Bayly, . . . ordered insurance by telephone and mail from or through plaintiff, Farwest General Agency, . . . it overtly performed acts making it a party to and participant in a business transaction in Washington even though it was contemplated by Bayly . . . that the insurer might be a foreign agency". 71 Wn.2d at 685.

In *Sorb Oil Corp. v. Batalla Corp.*, 32 Wn. App. 296, 299, 647 P.2d 514 (1982), Sorb contacted Batalla in Texas and offered products for sale. Batalla later ordered products on several occasions over a 20-month period. It placed its orders by phoning Sorb in Washington. When Batalla failed to pay, Sorb sued in Washington, but the trial court dismissed the action for lack of jurisdiction. Reversing, the appellate court said, "[a] party who does not initiate the business contact is not thereby immune from personal jurisdiction of Washington courts if a business relationship subsequently arises." 32 Wn. App. at 299. The court held that Washington had long-

---

[32]The opinion does not state which party made first contact with the other, or where that contact occurred.

arm jurisdiction, notwithstanding that Sorb had first contacted Batalla in Texas.

In *Cofinco of Seattle, Ltd. v. Weiss*, 25 Wn. App. 195, 605 P.2d 794 (1980), Cofinco was a Washington corporation and Weiss was apparently a New York resident. Weiss was selling shoes in New York when he was asked by Cofinco's president if he wished to sell shoes for Cofinco on the east coast. He agreed. At that point, there was an oral contract of employment, made "by phone at a time when [Weiss] was in New York and [Cofinco's president] was in Seattle". 25 Wn. App. at 196. Pursuant to this contract, Cofinco advanced money and goods, which it apparently sent to Weiss in New York. Weiss never came to Washington, and he never engaged in business here, except as already stated. When the arrangement went awry, Cofinco sued to recover its advances, but the trial court dismissed for lack of personal jurisdiction. The appellate court reversed, holding that Weiss had purposefully availed himself of the privilege of conducting activities within the State of Washington. 25 Wn. App. at 197.

In *Peter Pan Seafoods, Inc. v. Mogelberg Foods, Inc.*, 14 Wn. App. 527, 544 P.2d 30 (1975), Peter Pan was a Washington corporation and Mogelberg was a New York corporation. After a phone call initiated by Mogelberg, the two formed a business relationship and engaged in a series of transactions. Peter Pan then sued Mogelberg in Washington, and the trial court dismissed for lack of jurisdiction. The appellate court reversed, holding "that the jurisdictional power to adjudicate the issues between the parties exists in the Washington courts". 14 Wn. App. at 532. *See also Crown Controls, Inc. v. Smiley*, 47 Wn. App. 832, 737 P.2d 709 (1987), *remanded on other grounds*, 110 Wn.2d 695, 756 P.d 717 (1988).

In light of these authorities, this case involves minimum contacts sufficient to support long-arm jurisdiction. Between 1987 and 1989, the Kysars and Lambert engaged in several transactions that involved Washington as well as Massachusetts. The particular transaction at issue here involved an exchange of forms, letters and phone calls between

Washington and Massachusetts. It concluded with Lambert knowingly and purposefully ordering Christmas trees from Washington. The contract that was formed contained a choice-of-law clause to the effect that Washington law would govern any dispute, and such a clause is one factor tending to support the existence of minimum contacts. *Burger King*, 471 U.S. at 482; *Plus Sys.*, 804 F. Supp. at 118. In sum, Lambert engaged in knowing and purposeful minimum contacts with this state, the Kysars's cause of action arose out of those contacts, and it is reasonable for this State to exercise jurisdiction.

## IV

### COUNTERCLAIMS

In October 1991, Lambert alleged counterclaims based on common law quantum meruit, the Washington Consumer Protection Act (CPA), and the Massachusetts Consumer Protection Act. In December 1991, the Kysars moved to dismiss each claim. In February 1992 the trial court dismissed the quantum meruit claim on grounds it was immaterial, and the Washington CPA claim on grounds it did not involve a genuine issue of material fact. The court did not then rule on the Massachusetts CPA — no one had provided a copy of the Massachusetts statute — but later, at trial, the court refused to take evidence on that claim. Lambert assigns error to each of these rulings.

The quantum meruit counterclaim was properly dismissed. It pertained only to Lambert's deposit. Before and during trial, Lambert's position was that the Kysars had delivered nonconforming goods. If he was correct, he had the right to recover his deposit. That right, however, existed by virtue of the UCC, RCW 62A.2-711(1), and not by virtue of common law quantum meruit.[33] Thus, the quantum meruit counterclaim was immaterial.

Assuming, without holding, that the Massachusetts CPA applied in this case, we decline to grant relief. Lambert

---

[33]As we understand the record, the trial court did not do anything to impede Lambert's ability to claim his deposit at trial, pursuant to RCW 62A.2-711(1).

made no offer of proof when the trial court announced at trial that it would refuse to take evidence. *See* ER 103(a)(2). Thus, the record does not show whether he had any evidence, or, if he did, whether it would have shown a violation of the Massachusetts statute.[34] In other words, the record does not show that the trial court's ruling was prejudicial, and without prejudice relief is not warranted. *See* ER 103(a).

## V

### JURY INSTRUCTIONS

Lambert claims the trial court erred by refusing a jury instruction[35] that would have provided:

> There has been evidence in this case of Requests for Admission. Any matter admitted in response to a Request for Admission you must consider as conclusively established. That means a party who makes an admission in response to a request cannot later contradict or deny the admission.

Clerk's Papers, at 209.

The record on appeal does not contain any written requests for admission. At trial, however, Lambert's counsel read the following request to the jury: "Admit that you knew that Lambert wanted shipment by rail." He also read an answer which said: "True as to September but denied as to time of shipment."[36]

This admission affects nothing in this case. The Kysars did not dispute that they knew, in September, that Lambert wanted shipment by rail. Rather, they asserted that Lambert later altered this position and said he wanted the trees shipped by the cheapest means possible. Assuming without holding that the trial court's refusal to instruct on the effect of the admission was error, it was harmless beyond any doubt.

---

[34]Lambert never provided the trial court with a copy of the Massachusetts statute. Nor has he provided this court with a copy, despite RAP 10.4(c).

[35]Lambert also contends that the trial court erroneously failed to give two of his proposed instructions related to contract formation. However, his proposals were superfluous in view of our holding that a contract existed as a matter of law.

[36]Video Proceedings, July 14, 16:09.

## VI

### TERMS

The Kysars served Lambert in Massachusetts on July 30, 1991.[37] The Kysars obtained an order of default on Monday, September 30, 1991. Within a short time, Lambert discovered the order of default and moved to set it aside on grounds it had been entered before his time to answer had expired. The trial court granted the motion, but only on condition that Lambert pay $2,100 in terms.

Lambert had 60 days to answer the Kysars's complaint. RCW 4.28.185(2); RCW 4.28.180. Sixty days from July 30 was Saturday, September 28. When the last day of a time period falls on a Saturday, "the period runs until the end of the next day which is neither a Saturday, a Sunday[,] nor a legal holiday". CR 6(a). Thus, Lambert had until Monday, September 30, to answer the Kysars' complaint, and the Kysars took their order of default 1 day too soon.

When an order of default is obtained before the defendant's time to answer has expired, the disfavored party has the right to have it set aside unconditionally. *See Tiffin v. Hendricks*, 44 Wn.2d 837, 847, 271 P.2d 683 (1954) (premature default judgment); *Batchelor v. Palmer*, 129 Wash. 150, 158, 224 P. 685 (1924) (same); *Whatcom Cy. v. Kane*, 31 Wn. App. 250, 252, 640 P.2d 1075 (1981) (same). Here, then, Lambert had the right to have the order of default set aside unconditionally, and the trial court erred by imposing terms.

## VII

### REASONABLE ATTORNEY'S FEES

The parties' contract contained the following clause:

> In the event it should be necessary for the company to retain an attorney in order to enforce any of its rights under the terms of the order documents, purchaser agrees to reimburse company for all fees and costs paid or incurred.

Clerk's Papers, at 152.

---

[37]Initially, it appeared that service had been effected on July 29. On November 20, 1991, the deputy sheriff who made service filed an uncontroverted affidavit stating that his original affidavit of service had contained the wrong date, and that his activity log showed he had actually served Lambert on July 30.

The parties agree this clause is subject to RCW 4.84.330. That statute states:

> In any action on a contract or lease entered into after September 21, 1977, where such contract or lease specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he is the party specified in the contract or lease or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.

■ The statute itself provides that the prevailing party is the one "in whose favor final judgment is rendered". RCW 4.84.330. Various cases say the prevailing party is the one "who receives an affirmative judgment in its favor". *Marassi v. Lau*, 71 Wn. App. 912, 915, 859 P.2d 605 (1993); *see also Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 164, 795 P.2d 1143 (1990); *Ennis v. Ring*, 56 Wn.2d 465, 473, 353 P.2d 950 (1959). The prevailing party need not prevail on his or her entire claim, *Silverdale Hotel Assocs. v. Lomas & Nettleton Co.*, 36 Wn. App. 762, 774, 677 P.2d 773, *review denied*, 101 Wn.2d 1021 (1984), but he or she must substantially prevail. *Marassi*, 71 Wn. App. at 915-16; *Wesche v. Martin*, 64 Wn. App. 1, 13, 822 P.2d 812 (1992); *Rowe v. Floyd*, 29 Wn. App. 532, 535 n.4, 629 P.2d 925 (1981); *Marine Enters., Inc. v. Security Pac. Trading Corp.*, 50 Wn. App. 768, 772, 750 P.2d 1290, *review denied*, 111 Wn.2d 1013 (1988). If both parties prevail on major issues, there may be no prevailing party. *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 235, 797 P.2d 477 (1990); *Marassi*, 71 Wn. App. at 916; *Sardam v. Morford*, 51 Wn. App. 908, 911, 756 P.2d 174 (1988); *Puget Sound Serv. Corp. v. Bush*, 45 Wn. App. 312, 320-21, 724 P.2d 1127 (1986).

The Kysars argue that they are the prevailing party because they substantially prevailed. They point out that they originally sought $33,244, and they recovered $28,000.

Lambert responds that if the Kysars prevailed at all, it was on a noncontract claim. He reasons that they recovered

under RCW 62A.2-603;[38] that recovery under RCW 62A.2-603 is not recovery on a contract; and thus that the Kysars cannot rely on RCW 4.84.330.

At least under the circumstances present here, recovery under RCW 62A.2-603 is recovery on a contract claim. As already noted, the parties' "[c]ontract" is their "total legal obligation", including their "agreement" and its legal consequences. RCW 62A.1-201(11); RCW 62A.1-201(3). The parties' "agreement" is their bargain, plus its legal consequences according to the UCC and any other applicable law. RCW 62A.1-201(3). The legal consequences of a bargain involving the sale of goods include the ownership of the goods, RCW 62A.2-401, the buyer's right to accept or reject nonconforming goods, RCW 62A.2-601, the buyer's general obligation to hold rejected goods in his or her possession for the seller to retrieve, RCW 62A.2-602(2), and the merchant buyer's specific obligation to sell perishable rejected goods in his or her possession "for the seller's account". RCW 62A.2-603. Thus, the merchant buyer's obligation to sell perishable rejected goods is part of the parties' contract, and recovery under RCW 62A.2-603 is recovery on the contract for purposes of RCW 4.84.330.[39]

Lambert next responds that the jury verdict "afforded some measure of relief"[40] to both him and the Kysars. He

---

[38]According to Lambert, the jury verdict shows that the jury found he rejected the trees. We have no way of knowing whether that is correct, for neither party requested special interrogatories. For present purposes, however, we will assume that it is.

[39]This result is supported by *A&M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 495, 186 Cal. Rptr. 114, 127-28 (1982). The attorney's fee statute in that case was substantially similar to RCW 4.84.330. 135 Cal. App. 3d at 494 n.16. A&M recovered on a warranty that was not part of the parties' written agreement. FMC asserted "that A & M did not prevail on an action to enforce the written agreement and therefore that the trial court erred in awarding A & M attorney's fees". 135 Cal. App. 3d at 494. Relying on the California equivalent of RCW 62A.1-201(11), 135 Cal. App. 3d at 495 n.17, the appellate court upheld the trial court's award of reasonable attorney's fees, because "[t]he fact that a warranty is not stated in the written memorandum does not mean it is not part of the contract". 135 Cal. App. 3d at 495.

[40]Reply Br. of Appellant, at 23 (quoting *Marine Enters.*, 50 Wn. App. at 772).

reasons that the jury based its verdict on RCW 62A.2-603,[41] and that it could do that only by finding that he had rightfully rejected nonconforming goods. This means, he says, that the Kysars were in breach, *see* RCW 62A.2-301 (seller's duty to deliver conforming goods), and that there was no prevailing party for purposes of attorney's fees.

We disagree. As we have already noted, this case involved one statutory cause of action, and that cause was based on the UCC. Assuming the Kysars delivered nonconforming goods, the Kysars's right was to have Lambert return the money for which he sold the trees. RCW 62A.2-603. Lambert's right was to prove a claim for damages, if any. RCW 62A.2-711 through RCW 62A.2-713; RCW 62A.2-715. The Kysars enforced their right, while Lambert failed to enforce his. As a matter of law, the Kysars substantially prevailed, and they were entitled to reasonable attorney's fees.

The parties' remaining arguments lack merit or need not be reached.

We affirm, except that the order granting terms and the order denying attorney's fees are reversed. The case is remanded to the trial court with directions to award reasonable attorney's fees incurred in the Clark County Superior Court and the Washington State Court of Appeals.

SEINFELD, C.J., and HOUGHTON, J., concur.

Review denied at 126 Wn.2d 1019 (1995).

---

[41]Again, we have no way of knowing whether this is correct, because neither side requested special interrogatories. However, we will assume that it is.