**CAPITOL VIAL, INC., Plaintiff,**

v.

**INTERNATIONAL BIOPRODUCTS, INC., Defendant.**

No. 95–CV–0664 (FJS).

United States District Court, N.D. New York.

Oct. 10, 1997.

Alvin Friedman, Washington, DC, Counsel of Record for Plaintiff.

Couch, White, Brenner, Howard & Feigenbaum LLP, Albany, NY, Local Counsel for Plaintiff; Harold Iselin, of counsel.

Brennan & Rehfuss, P.C., Albany, NY, for Defendant; Stephen J. Rehfuss, of counsel.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, District Judge.

### Introduction

This diversity action arose out of a dispute over the interpretation and scope of an exclusive sales and distribution agreement between Plaintiff, Capitol Vial, Inc. ("CVI"), a New York corporation that manufactures and sells plastic vials,[1] and Defendant, International BioProducts, Inc. ("IBP"), a corporation organized under the laws of the State of Washington that sells laboratory supplies. CVI's first claim seeks a judgment declaring the contract void and unenforceable on the grounds of lack of material terms, lack of mutuality or consideration, impossibility, and breach of contract. The second claim seeks to have the contract declared void and unenforceable on the ground of fraudulent misrepresentation. IBP counterclaims for breach of contract and seeks damages of approximately six million dollars.[2]

### Background

In June of 1992, IBP became interested in selling CVI's hinge-capped plastic vials to its medical and scientific laboratory customers.[3] Negotiations between the two corporations resulted in a "Sales and Distribution Agreement," which was executed on September 22, 1993. In the agreement, CVI gave IBP the exclusive right to sell certain "PRODUCTS" which were to be "sold for the FIELD OF USE" in the "TERRITORY" for a five-year period.

On April 26, 1995, CVI brought this action in New York State Supreme Court and the action was thereafter removed to this Court.

Presently before the Court are the following motions: (1) motion by IBP for summary judgment on both of CVI's claims;[4] (2) motion by IBP for summary judgment on its counterclaim; and (3) motion by CVI for partial summary judgment on the issue of damages with respect to IBP's counterclaim for breach of contract.[5] The Court will address these motions *seriatim.*

## I. Motion by IBP for Summary Judgment of CVI's Entire Complaint

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is warranted if, when viewing the evidence submitted in a light most favorable to the nonmoving party, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Eastman Ko-*

---

1. The vials are made out of polypropylene homopolymer and are manufactured using a patented process which produces leak-proof single-piece vials in a unitary molding operation. The vials can be filled with a variety of liquids. CVI is the only manufacturer to produce such vials.

2. IBP also brought a second counterclaim for punitive damages which was dismissed on March 20, 1996.

3. Prefilled sterile dilution solution containers were a relatively new product in the laboratory supply business. The containers eliminated the time consuming preparation and sterilization that laboratory technicians had to perform before Phosphate, and 0.1% Peptone Water.

4. IBP brought this motion first to dismiss for failure to state a cause of action, then in the alternative for summary judgment. Because IBP filed its Fed. R. Civ. Pro. 12(b)(6) motion after serving its answer, the Court will consider the summary judgment motion as the appropriate motion. *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1357 (2d ed. 1990).

5. The Court previously denied the Plaintiff's motion for entire summary judgment on the counterclaim.

*dak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 457, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Commander Oil v. Advance Food Serv. Equip.,* 991 F.2d 49, 51 (2d Cir.1993). A genuine issue of fact is one that could be decided in favor of either party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Pursuant to the terms of the contract, the Court will apply the laws of the State of Washington to the interpretation and validity of the CVI–IBP agreement.[6]

As stated, CVI's first cause of action seeks to have the September 22, 1993 agreement declared void and unenforceable on the grounds of lack of material terms, lack of mutuality or consideration, impossibility, and breach of contract by IBP.

### A. IBP's Motion for Summary Judgment on CVI's First Claim

#### 1. Lack of Material Terms

■ Material terms that are essential to the formation of an enforceable contract are: identification of the parties, the subject matter of the agreement, term of years, quantity, quality of the goods, and price. *See Kysar v. Lambert,* 76 Wash.App. 470, 887 P.2d 431, 436 (1995).

■ The nine page agreement between CVI and IBP stated that it would be in effect for five years, identified both parties, defined "product," "field of use," and "territory," and stated a price of $0.085 per vial. The contract also required CVI to sell the vials and IBP to cause the vials to be filled with dilution solution. Thereafter, IBP had the exclusive right to promote and sell the prefilled vials in certain areas of the world. Clearly, the contract contained all material terms. Hence, the Court grants IBP's motion for summary judgment on CVI's claim of lack of material terms.

#### 2. Lack of Mutuality of Obligation or Consideration

CVI argues that the agreement lacked consideration because IBP had complete lib-

erty to decide the specific quantity of vials it would purchase, and, in fact, could even choose to purchase none. IBP contends that the requirement of IBP to use its best efforts in promoting and selling the vials constituted sufficient consideration.

■ If one of the parties to a contract has the freedom to choose whether or not to perform, the contract is void for lack of consideration. *See Parks v. Elmore,* 59 Wash. 584, 110 P. 381, 382–83 (1910); *see also Sargent v. Drew–English, Inc.,* 12 Wash.2d 320, 121 P.2d 373, 376 (1942). However, under the laws of the State of Washington, a promise to promote and develop to the best of abilities is valid and sufficient consideration for an exclusive dealings contract. *See Sargent,* 121 P.2d at 377.

Article 4 of the agreement required IBP to "maintain, as appropriate, adequate stock of PRODUCT(S) to cover the normal requirement of its customers." Furthermore, under Article 7, IBP was to "stimulate the sales of the PRODUCT(S) to the best of its ability." Despite the fact that IBP was not obligated to purchase a specific quantity of vials, the clause which required IBP to use its best efforts to stimulate the sales of the vials would appear to constitute a valuable form of consideration. *Cf. Sargent,* 121 P.2d at 377 (holding that the highly analogous promise to use its best efforts to promote and develop a market was sufficient consideration). Therefore, the Court finds no genuine issue of material fact with respect to CVI's claim that the contract lacked mutuality or consideration. Therefore, IBP is entitled to summary judgment on CVI's claim of lack of consideration, and the claim is dismissed.

#### 3. Impossibility

CVI argues that the parties' intention while negotiating the contract was to require the vials to be manufactured out of plastic that could withstand gamma irradiation, and that such a vial is impossible to construct. While IBP admits that its preferred method of sterilization was gamma irradiation, IBP

**6.** Article 12 of the contract contains a choice-of-law clause indicating that the agreement is to be governed by the laws of the State of Washington.

asserts that the intention of the parties was simply to have a sterile solution and that such could be accomplished through other methods of sterilization.[7]

 Impossibility may excuse a party from performing its obligations under a contract when the party will suffer extreme and unreasonable hardship due to an unavoidable event or occurrence. *See Metropolitan Park District of Tacoma v. Griffith,* 106 Wash.2d 425, 723 P.2d 1093, 1102 (1986). To determine whether the performance of the contract is impossible, the Court must ascertain the intention of the parties when they entered into the contract. *See Berg v. Hudesman,* 115 Wash.2d 657, 801 P.2d 222, 229 (1990). In the State of Washington, extrinsic evidence is admissible to determine such intent.[8]

Although the contract is somewhat ambiguous on this point, Annex I to the contract defined the "PRODUCTS" as "vials [which] may include tamper evident devices and other closure devices to ensure that the vial does not come open in transit." The definition also mandated these vials to have a certain level of technical performance, such as a minimum evaporative loss rate, and to be manufactured out of clear or opaque polypropylene.[9] None of the written correspondence detailing the contract negotiations contains any reference to an additional requirement that the vials be made of gamma stable plastic. For the Court to conclude that the parties specifically intended the use of such material, it would need to have read such a requirement into the contract. This the Court cannot do. Therefore, the Court finds that the use of gamma stable material was not a part of the contract, which would render its performance impossible.

### 4. Breach of Contract by IBP

CVI alleges that IBP breached the contract in two ways: (1) by not purchasing any vials from the inception of the contract until April 1995; and (2) by selling dilution solution in another manufacturer's bottle.[10] CVI alleges that it informed IBP several times that Mold 84 vials could not be manufactured to meet IBP's specifications, but that CVI was willing to sell the Intermed style vial to IBP.[11] However, IBP refused to place any orders. Furthermore, CVI argues that the contract forbade IBP from selling dilution solution in any other supplier's bottle. IBP contends that the reason why it never placed an order for the vials was because CVI kept informing IBP that the Mold 84 design was still under development and not yet ready. IBP also claims that the contract does not expressly preclude them from selling other dilution solution products.

 Although the contract gave IBP the exclusive right to promote and sell CVI plastic vials filled with dilution solution, the contract does not prohibit IBP from continuing to sell its solution products in another supplier's bottle.[12] However, a genuine issue of

---

7. IBP claims there were two possible methods of achieving the sterility of the product. The first method was to fill the vial with non-sterile solution and then sterilize the vial through terminal gamma irradiation. The second method was to sterile fill the vials, thereby eliminating the need for the vial to be made of gamma stable plastic.

8. "Such evidence is admissible regardless of whether or not the contract language is deemed ambiguous. At the same time, however, .... extrinsic evidence cannot be considered for the purpose of varying terms of a written contract." *U.S. Life Credit Ins. Co. v. Williams,* 129 Wash.2d 565, 919 P.2d 594, 597 (1996); *see also Berg,* 801 P.2d at 229–30.

9. The exact contract language is:

 2. The technical performance specifications of the PRODUCTS include the following:

 a. The evaporative loss rate is less than 1% of the liquid mass inside the vial at 95°F for a period of six months.
 b. The vial is made of polypropylene which is clear or opaque so that any liquid in the vial can be easily seen by the user when the vial is closed.

10. IBP began selling sterile filled dilution bottles manufactured by AidPak/Nutramax in March 1992, over one year before the CVI–IBP contract was signed.

11. The Mold 84 vial was being developed especially for IBP. The Intermed vial was short-skirted and holds 120 cc, while the long-skirted Mold 84 vial holds 145 cc.

12. The only language that may suggest otherwise is contained in Article 3 which states, "All PRODUCT(S) shall be purchased by IBP from

material fact does exist with respect to CVI's claim that IBP breached by refusing to purchase vials. CVI submitted several affidavits which state that IBP was informed that CVI could not manufacture a leak-proof Mold 84 vial but that CVI was willing to sell a substitute vial. (Abrams Aff. ¶ 7; Daggett Aff. ¶ 13; Belfance Aff. ¶ 9.) Furthermore, CVI submitted affidavits which stated that once IBP did place an order, such order was for Mold 84 vials that demanded CVI itself to sterile fill with dilution solution, despite the fact that there was never any agreement that CVI would sterile fill the vials. (Daggett Aff. ¶ 12.) In contrast, IBP submitted an affidavit which stated that as late as November of 1994, CVI continued to assert some "fine tuning" was necessary to make it leak-proof (Becker Aft. ¶ 27.) IBP also submitted an affidavit asserting it placed its first purchase order for Mold 84 vials in April 1995 after learning that CVI was selling such vials to a competitor. (Becker Aft. ¶ 29.) In view of these submissions, the Court finds that there is a genuine issue of material fact concerning whether IBP refused to purchase vials, and therefore denies IBP's motion for summary judgment on CVI's claim for breach of contract.[13]

## B. IBP's Motion for Summary Judgment as to CVI's Second Claim

As stated, CVI's second claim seeks to have the Court declare the contract void and unenforceable on the grounds of fraudulent misrepresentation.[14] CVI alleges that during negotiations IBP stated it was developing a "proprietary dilution solution" and "patentable product," when in reality the solution was rather common in the laboratory supply business. CVI maintains that it would never have entered into the contract if this representation was not made. In stark contrast, IBP argues that it never made any statement regarding a "proprietary product," "proprietary dilution solution," or patent.

A contract is voidable if one party entered into the agreement as a result of a fraudulent misrepresentation. *See Yakima County Fire Protection Dist. No. 12 v. City of Yakima,* 122 Wash.2d 371, 858 P.2d 245 (1993). The nine elements that must be established by the party seeking to avoid the contract due to fraudulent misrepresentation by clear and convincing evidence are: (1) a representation of as existing fact; (2) materiality; (3) falsity; (4) scienter; (5) intent to have the other party act on the representation; (6) the party who relied on the statement was unaware of its falsity; (7) reliance on the representation; (8) a right to rely; and (9) damages. *See Williams v. Joslin,* 65 Wash.2d 696, 399 P.2d 308, 308–09 (1965); *see also Turner v. Enders,* 15 Wash.App. 875, 552 P.2d 694, 696 (1976).

In order for CVI's fraudulent inducement claim to survive the motion for summary judgment, each element of the cause of action must be supported by evidence. While a genuine issue of fact may exist concerning whether the misrepresentation was actually made, CVI has not come forth with evidence to establish the remaining elements. Specifically, CVI has not submitted evidence from which scienter, intent to induce, or justifiable reliance can be inferred.[15] The submitted evidence shows an

CAPITOL at the price indicated in Annex II." This language does not require IBP to purchase all containers from CVI; rather, it sets out the price at which the vials were to be purchased.

13. The Court does not reach the issue of whether such a breach of contract by IBP, if proven, could be sufficiently material to justify a rescission of the entire contract.

14. Although neither party addressed negligent misrepresentation in their papers, CVI did assert it as a basis for voiding the contract in its complaint. Even if there was a genuine issue of material fact surrounding a false statement that was negligently made, the Court was unable to find precedent in any case decided by a Washing-

ton State court that supported the proposition that negligent misrepresentation is a viable ground for nullifying a contract. Therefore, the Court will only discuss the fraudulent misrepresentation claim that was briefed by both parties.

15. On the contrary, only *lack* of justifiable reliance can be inferred from the evidence submitted. For example, CVI's Marketing Director stated in his affidavit that, IAP "never said what the product was, and [CVI representatives did not have] any idea what [IAP] was talking about as far as the product was concerned. In fact, we did not care so long as IAP's product would be 'proprietary,' that is a product that no one else could duplicate." Daggett Aff., ¶ 6.

arms-length contract negotiated by experienced businessmen, in which word "proprietary" does not appear in the contract or in any of the correspondence between the parties. Most importantly, if the proprietary nature was of such importance, an experienced businessman would have insisted that the contract be conditioned on the development of the patentable product, especially since CVI had twice recommended changes to the contract.[16] Therefore, IBP's motion for summary judgment of the fraudulent inducement claim is granted.

## II. IBP's Motion for Summary Judgment on its Counterclaim

IBP argues that CVI breached by refusing to sells vials to IBP and by entering into an exclusive sales and distribution agreement for the same product and roughly the same territory with Weber Scientific, Inc. ("Weber"), a competitor of IBP. The CVI–Weber contract required CVI to sterile fill Mold 84 vials with dilution solution, then sell the prefilled vials to Weber, who in turn would market and sell the vials to scientific, medical, and research laboratories. CVI argues that its contract with IBP covered only *unfilled* vials, and therefore CVI was only precluded from selling empty vials to IBP competitors who would fill the vials with dilution solution themselves. Thus, CVI contends that it could, without breaching the contract, sell *filled* vials to any other company.

■ The contract between IBP and CVI explicitly described the products and field of use as being "prefilled dilution vials for use by the laboratory for the dilution of samples." While the term "prefilled" could be stretched to mean an empty vial prior to being filled, the Court finds that the term more accurately means a filled vial, especially because the contract continues by stating that "[t]hese hinged cap vials *contain* diluent volumes of approximately 90 ml and 99 ml." [17] While it appears that CVI violated the contract by granting Weber an exclusive sales and distribution agreement, issues of material fact exist regarding whether CVI may have been excused from performance and, in effect, considered its contract rescinded or cancelled by the possible IBP breach. Therefore, because the Court finds the breach by CVI so interwoven with the possible breach by IBP, IBP's motion for summary judgment on its counterclaim is denied.

## III. CVI's Motion for Partial Summary Judgment on IBP's Claim for Damages

CVI seeks partial summary judgment to limit the amount of damages for which it can possibly be held liable. Specifically, CVI contends that IBP's damages should include only those areas encompassed by both contracts.[18] IBP argues that when the CVI–Weber contract was entered into, CVI not only breached with regard to the overlapping areas, but also constructively breached as to the remaining territories in the CVI–IBP agreement. In light of the fact that this Court has found genuine issues of material fact surrounding possible breaches by both parties, the motion for partial summary judgment on damages is premature, and therefore is denied.

### Conclusion

After carefully considering the papers submitted, the arguments of counsel, the applicable law, and the entire file in this matter, it is hereby

ORDERED that IBP's motion for summary judgment on CVI's first claim is

16. Prior to signing the contract, CVI recommended a change to Article 19(b). Then upon signing the contract, CVI made a pen and ink change to Article 2 entitled "Scope of the Contract."

17. Interestingly, the CVI–Weber contract used nearly the same language as the CVI–IAP contract by describing the vials as "accurately prefilled." Undisputedly, the CVI–Weber contract encompassed filled vials. Furthermore, a Weber advertisement for the vials and an AidPak advertisement for dilution bottles used the word "prefilled" to describe the product which are filled with dilution solution. Thus, customary usage of the term "prefilled" in the laboratory supply business obviously means filled, not empty.

18. The CVI–IBP contract encompassed the United States, Mexico, Canada, the European Common Market, Australia, and New Zealand. The CVI–Weber contract included only North America and South America.

GRANTED, except to the extent such claim is based on breach of contract, and it is further

ORDERED that IBP's motion for summary judgment on CVI's second claim is GRANTED, and it is further

ORDERED that IBP's motion for summary judgment on its counterclaim is DENIED, and further

ORDERED that CVI's motion for partial summary judgment is DENIED.

**IT IS SO ORDERED.**